IN THE SUPREME COURT OF MISSISSIPPI

NO. 2007-KA-00666-SCT

*RICHARD EARL BIRKHEAD*

*v.*

*STATE OF MISSISSIPPI*

<u>ON MOTION FOR REHEARING</u>

DATE OF JUDGMENT: 03/08/2007
TRIAL JUDGE: HON. MARGARET CAREY-MCCRAY
COURT FROM WHICH APPEALED: WASHINGTON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: OFFICE OF INDIGENT APPEALS
BY: LESLIE S. LEE
  JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: STEPHANIE BRELAND WOOD
DISTRICT ATTORNEY: JOYCE CHILES
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 02/17/2011
MOTION FOR REHEARING FILED: 03/05/2009
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.    Richard Earl Birkhead's motion for rehearing is denied.  The previous majority

opinion of this Court is withdrawn and this opinion is substituted therefor.

¶2.    On November 21, 2003, Birkhead was indicted for the capital murder of Walter Lanier

while engaged in a robbery.[1]  A four-day jury trial was conducted in the Circuit Court of

---

[1]Birkhead filed a pretrial motion for a mental evaluation at the Mississippi State Hospital at Whitfield, which was granted.  A neuropsychologist opined that Birkhead was mildly mentally retarded.  The Mississippi State Hospital staff disagreed with that diagnosis

Washington County. After the State rested, Birkhead moved for directed verdict, which the trial court denied. Birkhead did not testify and offered no witnesses. The jury found Birkhead guilty of capital murder. Birkhead then renewed his motion for directed verdict, or in the alternative, sought a new trial. The trial court denied his motion. Birkhead was sentenced as a habitual offender and was ordered to serve life without parole in the Mississippi Department of Corrections. Birkhead appeals from this judgment.

¶3.     Birkhead presents the following issues for appeal:

I.      Whether the trial court erred when it determined the defense had not established a prima facie case of discrimination in the State's selection of jury members and use of peremptory strikes.

II.     Whether the trial court abused its discretion in allowing the death certificate into evidence when it showed a purported time of injury.

III.    Whether Birkhead's constitutional right to confrontation was violated by the admission of the victim's death certificate into evidence.

IV.     Whether the trial court erred in not dismissing a sleeping juror.

V.      Whether the trial court erred in not declaring a mistrial after a witness's comment regarding Birkhead's exercise of his right to remain silent.

VI.     Whether the trial court erred in giving Jury Instruction CR-12 regarding attorney's notes.

VII.    Whether there was cumulative error which deprived Birkhead of his right to a fundamentally fair trial.

**FACTS**

¶4.     On July 12, 2003, eighty-one-year-old Walter Lanier left Hamburg, Arkansas, between 3:00 and 4:00 p.m., to go to a gaming boat (casino) in Greenville, Mississippi.

---

and determined that Birkhead was not mentally retarded. The trial court, citing *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), granted Birkhead's motion to preclude the State from seeking the death penalty. The trial court's order granting the motion to preclude the death penalty is not at issue in this appeal.

Surveillance tapes from the Jubilee Casino show the victim, Lanier, entering the casino at 9:00 p.m. on July 12, 2003, and exiting the same casino on July 13, 2003, at 2:17 a.m.

¶5. The State's first witness was Lanier's daughter. She testified that "[a]fter my mom passed away, . . . I don't think [Lanier] liked staying in the house very much. A lot of times he would just sit in the car and drink his beer, smoke a cigarette, and listen to the radio. He did that a lot." *Inter alia*, she further testified that Lanier had smoked Montclair-brand cigarettes and generally drank Budweiser beer.

¶6. Officer Jeffery Parsons, who was a patrolman with the Washington County Sheriff's Office, testified he heard on his scanner that there was a disturbance as the nightclub was closing at the Jubilee Casino. While Officer Parsons was driving through the parking lot of the casino, he noticed a gray Cadillac with a white male seated in the front seat and an African-American male seated in the back seat, which raised his suspicion. Momentarily, Officer Parsons was flagged down by an unknown female, who directed him back to the same Cadillac.

¶7. When Officer Parsons returned to the Cadillac, he saw the defendant exit the rear passenger door and walk rapidly toward the casino. Officer Parsons radioed an officer of the Greenville Police Department who was also in the parking lot, and advised that the defendant should be detained. Officer Parsons then exited his patrol car, pursuing and maintaining visual contact with the defendant. Officer Parsons testified the lighting was good and that no other people were walking in that area of the parking lot.

¶8. Officer Parsons trailed the defendant until he saw Officer Rod Shannon detain him. About five to six steps from where the defendant was detained, Officer Parsons found a

knife. Officer Parsons did not touch the knife, but instead notified a supervising officer. Officer Parsons confirmed that the defendant was the same male whom he had seen exit the back seat of the Cadillac. The man identified himself as Richard Birkhead. A supervising officer collected Birkhead's red-stained shirt, along with the knife, which had blood on its blade, and gave them to Investigator Misty Litton as evidence.

¶9. After Birkhead was placed in the custody of the Greenville Police Department, Officer Parsons returned to the Cadillac. There, Officer Parsons found Greenville Police Department officers and paramedics from Delta Regional Medical Center ("DRMC"), who unsuccessfully tried to resuscitate the victim, later identified as Lanier, in the car. Lanier was transported to DRMC, where he was officially pronounced dead by Dr. Marilyn McLeod. Officer Parsons did not recall the time he arrived at the scene, nor did his report reflect a time.

¶10. Just outside Lanier's vehicle, investigators collected several Montclair-brand cigarette butts and one Star-brand cigarette butt, along with four empty Budweiser beer cans. From the back seat, investigators collected a small blue ice chest and a Budweiser twelve-pack carton containing eight unopened cans.

¶11. Officer Brian Payne testified that when he had arrived at Lanier's vehicle, in response to Officer Parsons's call, Officer Scott Stewart and Officer Jason Jenkins already were there. According to Officer Payne, there were no signs of forced entry into the car. Officer Stewart advised him that "the subject in the car was bleeding and is possibly deceased." Officer Payne attempted to take Lanier's pulse and found none. Lanier exhibited no other signs of life. Nonetheless, Officer Payne began performing chest compressions on Lanier. He found

4

the victim "warm to the touch[,]" with his blood not yet coagulated, i.e., "the blood had not started to clot . . . ." Officer Payne observed that the blood was "still fresh," and opined the stabbing had "happened within the last five to ten minutes."[2] Shortly after Officer Payne arrived, paramedics were on the scene. Officer Payne rode with the paramedics in the ambulance transporting Lanier to the hospital. Officer Payne testified that Dr. McLeod pronounced Lanier dead at the hospital.

¶12. Following Officer Payne's testimony, the State moved to have a certified copy of Lanier's death certificate admitted into evidence. When the death certificate was offered, the following exchange took place:

| | |
|---|---|
| Court: | Is there any objection? |
| Defense Counsel: | Your Honor, may we approach? |
| Court: | Yes. |

(Conference at the Bench, out of the hearing of the jury).

| | |
|---|---|
| Defense Counsel: | On the report they have the hour of injury as being 3:38 a.m.[3] I don't know that they have established that. They have the hour of death as being 3:50 a.m. I don't think they have established that. We will object to it being introduced. |
| State Counsel: | It's a state official record, Your honor, certified under the laws of the State of Mississippi. |
| Court: | I will allow it. |
| Defense Counsel: | I have a question. Is anybody coming to testify about that death certificate? |
| State Counsel: | It's a certified copy. It's admissible under the rules. |

---

[2]Officer Payne volunteered that he previously had worked with an ambulance service, and another witness testified that Officer Payne had served as an Army medic.

[3]While Box 29c of the death certificate, "Hour of Injury," reads "3:38 a.m.," separate sections of Box 25 are left blank regarding the "[i]nterval between onset and death."

5

Defense Counsel:     Okay.[4]

¶13.    Officer Stewart testified that he had received a dispatch call at "3:38 [a.m.] by paperwork."  When he arrived on the scene along with Officer Jenkins, he opened the passenger side door and unsuccessfully tried to rouse Lanier.  He then checked the victim for movement, breathing, a pulse, or any other signs of life, and found none.  Officer Stewart corroborated Officer Payne's testimony that Officer Payne had arrived shortly thereafter and had begun administering CPR on Lanier.  Officer Stewart did not know what time Lanier died.

¶14.    Greenville Police warrant officer Jimmy Myrick testified he had arrived on the scene at 3:38 a.m.  Officer Myrick transported Birkhead to the Greenville police station.  He observed no scratches or bruises on Birkhead or signs that Birkhead had been involved in any physical altercation.  On the way to the station, Officer Myrick received a call from Officer Payne, who was at the hospital with Lanier, that Lanier had been pronounced dead.  He was advised the time of death was 4:01 a.m., although Officer Myrick "could not advise as to whether it was possible that Lanier died before 4:01."

¶15.    At the Greenville police station, Officer Myrick found $29.09 of blood-splattered money on Birkhead.  Officer Myrick called Investigator Litton and waited with the money at the booking counter for her to process it.  After Officer Myrick, several other Greenville

---

[4]As this colloquy reflects, Birkhead made neither a Confrontation Clause objection, nor a hearsay objection, to the trial court.  It is unclear if the objection presented pertained to authenticity or admissibility.  Out of an abundance of caution, however, this Court will address all.  *See* Issues II and III *supra*.

Police Department officers testified. One officer, Russell Frazier, testified to the presence of blood on Birkhead's blue jeans (which also were taken for evidence at booking).

¶16. Forensic DNA analyst Huma Nasir testified that the blood on the money found in Birkhead's pocket, on Birkhead's jeans, and on the knife belonged to the victim, Lanier. Nasir testified that Birkhead's DNA was on a washcloth found in Lanier's car and, based on a partial DNA profile, Birkhead's DNA also was on a baseball cap found in the car. Ken Gill, a latent fingerprint examiner, testified that Birkhead's fingerprints were found on the car's rear passenger door as well as on the silver strip above the door handle.

¶17. Lanier's autopsy revealed a bruise on his forehead and a stab wound to his chest. The pathologist testified that, while he could not determine Lanier's exact position at the time of the attack, the wound to the front of Lanier's body could have been made by a person seated in the back seat of the vehicle as Lanier sat in the front seat. The pathologist testified he did not determine a time of death, as "I was not asked to, and I did not do that, and would not have had the requisite information at that time to come to a conclusion."

¶18. Numerous other witnesses testified before the State rested. In total, twelve Greenville Police Department officers testified. After the State rested, the defense moved for a directed verdict. When that motion was denied, the defense offered no witnesses.

¶19. Birkhead's defense team structured its arguments in opening statement and closing argument around the lapse of time between when the victim, Lanier, left the casino at 2:17 a.m. until his body was discovered at 3:38 a.m. In opening statement, one of Birkhead's attorneys repeatedly stressed that Lanier was unaccounted for in the one-hour-and-twenty-one-minute interim. Defense counsel theorized that Birkhead had been on his way to the

7

casino when he had seen Lanier slumped over in the car and believed Lanier was sleeping or intoxicated. Defense counsel argued Birkhead saw property on the back seat and took the opportunity to steal it. Defense counsel maintained Lanier was dead before Birkhead entered the vehicle. No witnesses were called to support this theory.

¶20.  The exact "time of injury" (apart from the date it occurred, which is undisputed) is not an essential element of the crime for which Birkhead was indicted, and the State never attempted to establish an exact "time of injury." The State presented evidence and argument to support each essential element of the crime. Under proper instruction of the trial court, it was for the jury to determine whether to accept or reject the State's case and defendant's theory. After deliberation, the jury found Birkhead guilty of capital murder. After denial of his motion for judgment notwithstanding the verdict ("JNOV"), or in the alternative, for a new trial, Birkhead appealed his conviction to this Court. Absent reversible error, this Court is duty-bound to affirm the jury's verdict.

## ANALYSIS

I.    **Whether the trial court erred when it determined the defense had not established a prima facie case of discrimination in the State's selection of jury members and use of peremptory strikes.**

¶21.  According to this Court:

> [a] **Batson** challenge to a peremptory strike should proceed as follows. First, the defendant must establish a prima facie case of discrimination in the selection of jury members. **Berry v. State**, [703 So. 2d 269, 294 (Miss. 1997)] (citing **Batson v. Kentucky**, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)). The prosecution then has the burden of stating a racially neutral reason for the challenged strike. If the State gives a racially neutral explanation, the defendant can rebut the explanation. Finally, the trial court must make a factual finding to determine if the prosecution engaged in purposeful discrimination. If the defendant fails to rebut, the trial judge must

8

base his decision on the reasons given by the State. ***Thorson v. State***, 721 So. 2d 590, 593 (Miss. 1998).

***Berry v. State***, 802 So. 2d 1033, 1037 (Miss. 2001). Additionally, this Court has held that:

> [o]n appellate review, a trial court's determinations under ***Batson*** are accorded great deference because they are largely based on credibility. ***McGilberry v. State***, 741 So. 2d 894, 923 (Miss. 1999) . . . . This Court will reverse only when such decisions are clearly erroneous. ***Woodward v. State***, 726 So. 2d 524, 530 (Miss. 1997); ***Lockett v. State***, 517 So. 2d 1346, 1349-50 (Miss. 1987).

***Berry***, 802 So. 2d at 1037.

¶22.    This case was tried in Washington County in 2007. According to the 2005-2007 American Community Survey Three-Year Estimates,[5] the estimated total population of Washington County was 56,605. The estimated population of blacks or African-Americans in the county was 37,119, 66.5 percent of the total population. U. S. Census Bureau – Washington County, Mississippi – Fact Sheet, http://factfinder.census.gov (last visited February 14, 2011).

¶23.    During jury selection, both parties made ***Batson*** challenges. *See **Batson***, 476 U.S. at 79. The State based its challenge on the defense's striking all the white jurors to arrive at a predominately African-American panel. The court found the reasons given by the defense to be race-neutral.

¶24.    The defense then raised its ***Batson*** challenge, stating that all the jurors struck (thus far) in the selection by the State were African-American. At that stage of the proceeding, the

---

[5]Although the American Community Survey (ACS) produces population, demographic, and housing-unit estimates, the Census Bureau's Population Estimates Program produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns, and estimates of housing units for states and counties.

jury was composed of one African-American male, seven African-American females, one white female, and two jurors whose race and gender are not made known in the record. The race and gender of the two alternates also are not made known in the record. The racial makeup of the venire, of the jurors who ultimately were chosen, and of other potential jurors struck by the State likewise is not in the record. Therefore, the presumptive conclusion made by the dissent of a **Batson** violation and an error by the trial judge is unsupported by the record. (Dissenting Opinion at ¶ 67-68). We cannot override the trial court when this Court *does not even know* the racial makeup of the venire or the jury. The trial court is accorded great deference because it uniquely is in a position to observe what a blank record fails to reveal. *See Berry*, 802 So. 2d at 1037.

¶25.   After the trial court questioned the racial makeup of the jury, the defense stated its belief that **Batson** was based on the potential jurors struck rather than the resultant panel composition. The trial court responded, "[i]t's also based on the composition of the jury as well. You take all of that into consideration. And I'm not going to find that that's a prima facie case." Birkhead argues the trial court misinterpreted **Batson.** However, this Court, citing **Batson,** has held:

> [i]n order to establish a prima facie case, [Defendant] must show that the facts and circumstances give rise to the inference that the prosecutor exercised the peremptory challenges with a discriminatory purpose. *Strickland v. State*, 980 So. 2d 908, 915 (Miss. 2008); *Tanner v. State*, 764 So. 2d 385, 393 (Miss. 2000) (citing *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991)); *Randall v. State*, 716 So. 2d 584, 587 (Miss. 1998) (citing *Batson*, 476 U.S. at 94, 106 S. Ct. 1712). "In deciding whether the defendant has made the requisite showing, the trial court should consider *all* relevant circumstances." [*Batson,* 476 U.S. at 96].

*Chamberlin v. State*, 989 So. 2d 320, 337 (Miss. 2008) (emphasis added).

10

¶26.    Birkhead submits to this Court that the fact that the State had not exhausted its peremptory challenges or that it left African-Americans on the jury did not relieve the State from its **Batson** burden.  Birkhead asserts that the State's use of its first five peremptory challenges against African-Americans merits an inference of discrimination.  However:

> [i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

**Batson,** 476 U.S. at 96-97.  The record does not aid this Court in discerning such a pattern.  Additionally, all the cases relied upon by Birkhead in his brief state the racial makeup of the final jury or the race of the other potential jurors struck by the State. We are not provided with sufficient information in this case to overturn Judge Carey-McCray's trial decision.  "The burden falls upon an appellant to ensure the record contains 'sufficient evidence to support his assignments of error on appeal.'"  **Hansen v. State**, 592 So. 2d 114, 127 (Miss. 1991) (citations omitted).

¶27.    Furthermore,  "[t]here is a presumption that the judgment of the trial court is correct and the burden is on the Appellant to demonstrate some reversible error to this Court."  **Juarez v. State**, 965 So. 2d 1061, 1065 (Miss. 2007) (citation omitted).  When the **Batson** challenge was made, eight of nine jurors whose race is known to this Court were African-American.  As the record is devoid of information regarding the racial makeup of the venire,

11

the final composition of the jury selected, and the race of the additional jurors struck by the State, Birkhead has failed to establish a record of **Batson** violations. We can discern no reversible error by the trial court in the juror-selection process.

**II.      Whether the trial court abused its discretion in allowing the death certificate into evidence when it showed a purported time of injury.**

¶28.    "The standard of review governing the admissibility of evidence is whether the trial court abused its discretion." **Harris v. State**, 970 So. 2d 151, 154 (Miss. 2007) (citations omitted).

¶29.    The authenticity of the death certificate is established by Mississippi Rule of Evidence 902(4), which states:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following: . . .
>
> (4) **Certified Copies of Public Records**. A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification . . . .

Miss. R. Evid. 902(4). The certified copy of the death certificate[6] presented in this case fits within the provisions of Rule 902(4).

¶30.    No legitimate debate can be made that a considerable amount of the information contained within any death certificate is hearsay. Similarly, no debate exists that a death certificate is a vital statistic. *See* Miss. Code Ann. §§ 41-57-1 to 41-57-2 (Rev. 2009) (death

---

[6]*See* Miss. Code Ann. § 41-57-9 (Rev. 2009) (regarding a death certificate, "[a] facsimile signature of the [state registrar of vital statistics] shall be sufficient for certification when the certificate shall have impressed thereon the seal of the Mississippi Department of Public Health.").

12

certificates are governed by the bureau of vital statistics and are available to "any person with a legitimate and tangible interest in such records . . . ."). Mississippi Rule of Evidence 803(9) provides a hearsay exception regarding records of vital statistics.[7] *See* Miss. R. Evid. 803(9). That rule provides, in pertinent part, that:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

> (9) **Records of Vital Statistics**. Records or data compilations of vital statistics, in any form, if the report thereof was made to a public officer pursuant to requirements of law.[8]

Miss. R. Evid. 803(9). *See also* **Shell v. State**, 554 So. 2d 887, 898 (Miss. 1989), *overruled on other grounds by* **Shell v. Mississippi**, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990) ("[a] death certificate clearly falls under the language of" Rule 803(9)). As my colleague Presiding Justice Carlson has pointed out previously, "[a] rule which is not enforced is no rule at all." **Allen v. Nat'l R.R. Passenger Corp.**, 934 So. 2d 1006, 1011 (Miss. 2006) (quoting **Salts v. Gulf Nat'l Life Ins. Co.**, 872 So. 2d 667, 674 (Miss. 2004)). Unlike Rule 803(8) regarding public records and reports, Rule 803(9) provides no exclusions to its hearsay exception.

---

[7]Rule 803(9), very similar to Federal Rule of Evidence 803(9), was adopted on September 24, 1985, to "govern all proceedings in any action had on or after January 1, 1986 . . . ." *See* Order Adopting the Mississippi Rules of Evidence; Fed. R. Evid. 803(9).

[8]Mississippi Code Section 41-57-1 provides that "[a] bureau of vital statistics shall be established by the State Board of Health, which shall provide an adequate system for the registration of . . . deaths and preservation of vital statistics on forms prescribed by said Board of Health . . . ." Miss. Code Ann. § 41-57-1 (Rev. 2009). The death certificate presented in this case comported with the certification standards provided in Mississippi Code Section 41-57-9. *See* footnote 6 *supra*.

¶31. Birkhead and the dissent rely upon the pre-Rules case of *Flowers v. State*, 243 So. 2d 564 (Miss. 1971), for the proposition that "death certificates could be introduced into evidence but used only to show 'the physical cause of death.'" (Dissenting Opinion at ¶ 81). But even Birkhead acknowledges that *Flowers* is "old law . . . ." The "Order Adopting the Mississippi Rules of Evidence" states that the Mississippi Rules of Evidence "shall be, and . . . are adopted as rules of evidence governing proceedings in the courts of the State of Mississippi *to the extent and with the exceptions provided in said rules . . . .*" Order Adopting the Mississippi Rules of Evidence (emphasis added). Rule 803(9) includes no *Flowers*-like qualification. Moreover, Rule 1103 adds that "[a]ll evidentiary rules, whether provided by statute, *court decision* or court rule, which are inconsistent with the Mississippi Rules of Evidence are hereby repealed." Miss. R. Evid. 1103 (emphasis added). Therefore, today's decision does not create any new rule of evidence, as Rule 803(9) has applied to "all actions and proceedings in the courts of the State of Mississippi" since January 1, 1986. Miss. R. Evid. 1101(a); Order Adopting the Mississippi Rules of Evidence. In essence, the dissent faults both the trial court and the Majority for enforcing a rule which it disfavors, as opposed to seeking an amendment via the Rules Committee. The trial court *sub judice* is not in error for following the rules of evidence and our precedent that a death certificate and the "[r]ecords . . . of vital statistics" contained therein are admissible. *See* Miss. R. Evid. 803(9); Miss. Code Ann. § 41-57-2 (Rev. 2009); *Shell*, 554 So. 2d at 898. Thus, this issue is without merit.

¶32. But even if we were to ignore Rule 803(9), the precedent established in *Shell*, and the State's waiver argument,[9] and assume *arguendo* that the trial judge erred in permitting the "time of injury" entry to go before the jury, we conclude such a presumed error would be harmless. This Court has held, "the inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether that error was 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *Thomas v. State*, 711 So. 2d 867, 873 (Miss. 1998) (quoting *Yates v. Evatt*, 500 U.S. 391, 403, 111 S. Ct. 1184, 1187, 114 L. Ed. 2d 432, 449 (1991)). The jury was presented with overwhelming evidence of Birkhead's guilt. Even the dissent acknowledges that "the State's evidence was strong . . . ." (Dissenting Opinion at ¶ 72). Moreover, in the case *sub judice*, the prosecution did not seek to use the "time of injury" entry to satisfy even one of the essential elements of its case, for "time of injury" was not such an element. Indeed, it was defense counsel who repeatedly interjected the time of 3:38 a.m. to aid the defense, initially, in its opening statement and, finally, in its closing argument.[10] The jury was presented with Birkhead's attempt to create doubt via a lapse-of-time argument, which the State countered with cigarette butts and empty beer cans outside the victim's car; the testimony of Lanier's daughter; and the circumstances surrounding Birkhead's exit from the vehicle and recovery of the blood-stained weapon, money, clothing, etc.

---

[9]The State argues that Birkhead is precluded from now arguing about the "time of injury" entry on appeal when, after his objection was overruled, Birkhead neither sought to exclude nor to redact the hour-of-injury/death entries, nor to ask the trial judge to give a limiting instruction regarding the entries.

[10]The State made no reference to the "time of injury" in its opening statement or closing argument.

¶33.    Thus, this Court alternatively concludes that *in this case* the failure to redact the "time of injury" from the victim's death certificate was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id*. Accordingly, this argument likewise is without merit.

III.    **Whether Birkhead's constitutional right to confrontation was violated by the admission of the victim's death certificate into evidence.**

¶34.    "This Court reviews de novo a Confrontation Clause objection." **Smith v. State**, 986 So. 2d 290, 296 (Miss. 2008) (citations omitted). The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI (emphasis added). *See also* **Crawford v. Washington**, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177, 192 (2004) (the Confrontation Clause "applies to 'witnesses' against the accused – in other words, those who 'bear testimony.' 2 N. Webster, An American Dictionary of the English Language (1828).").

¶35.    Thus, introduction of evidence admitted via a hearsay exception does not necessarily foreclose Confrontation Clause scrutiny. **Crawford** held that "[w]here testimonial evidence is at issue . . . the *Sixth Amendment* demands what the common law required: unavailability and a prior opportunity for cross-examination." **Crawford**, 541 U.S. at 51-52. The United State Supreme Court has since stated that "testimonial statements" can "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. . . . It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." **Davis v.**

16

*Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273, 165 L. Ed. 2d 224 (2006). *See also*

*Crawford*, 541 U.S. at 68 ("[w]here nontestimonial hearsay is at issue, it is wholly consistent

with the Framers' design to afford the States flexibility in their development of hearsay law

– as does [*Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)],[11] and

as would an approach that exempted such statements from *Confrontation Clause* scrutiny

altogether.").

¶36.    As to what is "testimonial," *Crawford* provided:

> [v]arious formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[;]" "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[;]" "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]"

*Crawford*, 541 U.S. at 51-52 (internal citations omitted).  The United States Supreme Court

has since made additions to the "core class" of testimonial statements.  In *Davis*, the Court

made the limited holding, for the purpose of deciding "the present cases[,]"[12] that:

> [s]tatements are nontestimonial when made in the course of *police interrogations* under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing

---

[11]In *Crawford*, the Court overruled *Roberts* insofar as it stood for the proposition that the admissibility of hearsay evidence depends upon whether "it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Crawford*, 541 U.S. at 60, 67-68 (quoting *Roberts*, 448 U.S. at 66).

[12]In *Davis*, two cases were considered for the purpose of determining "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' . . . ." *Davis*, 547 U.S. at 817.

17

emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822 (emphasis added). Based thereon, the Court concluded that a 911 call is generally nontestimonial as it "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance[,]" but that an affidavit obtained by an interrogating officer in the absence of emergency circumstances was testimonial.[13]  *Id*. at 827, 829-30, 834.  In *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 174 L. Ed. 2d 314, 77 U.S.L.W. 4574 (2009), like this Court in its 1985 ruling in *Barnette v. State*, 481 So. 2d 788 (Miss. 1985), the United States Supreme Court found that a certificate of analysis pertaining to the nature of the substance (i.e., cocaine, a necessary element for the crime of distributing and trafficking in cocaine) was testimonial and, therefore, was erroneously admitted.  *See Melendez-Diaz*, 129 S. Ct. at 2527; *Barnette*, 481 So. 2d at 791.

¶37.　In *Melendez-Diaz*, the Court also notably stated that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because – having been *created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial* – they are *not testimonial*." *Id*. at 2539-40 (emphasis added). *See also United States of America v. Lopez-Moreno*, 420 F. 3d 420, 437 (5th Cir. 2005) (quoting *Crawford*, 541 U.S. at 51, 56)

---

[13]However, the Court added that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at 833.

18

("business records, which are analogous to public records, are 'by their nature . . . not testimonial' and not subject to the requirements of the Confrontation Clause.").

¶38. Birkhead argues "[p]olice were well aware that they had a subject in custody at the time Mr. Lanier arrived at the hospital." Birkhead offers argument, without proof, that the "time of injury" entry must have been supplied by the police "with an eye toward being used in a future criminal proceeding against [him]." *See* **Crawford**, 541 U.S. at 56 ("[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse. . . ."). In so arguing, Birkhead asks this Court to indulge in a two-fold assumption without any supporting evidence. First, Birkhead assumes that the "time of injury" of 3:38 a.m. "likely" was given to "the doctor signing the death certificate"[14] by police officers at the hospital,[15] despite the absence of any evidence to support this indulgence.[16] Two officers (Officer Stewart and Officer Myrick) referenced 3:38 a.m., in responding to an ongoing emergency. Neither they nor any other witnesses obtained the time from an interrogation of an unavailable declarant. Both testified and were subject to confrontation. Out of the numerous officers who testified, not one swore that he or she knew the "time of injury."[17] Second, Birkhead asks this Court to assume that

_____

[14]No doctor signed the death certificate.

[15]According to the record before us, the only police officer at the hospital was Officer Payne, who not only was available for examination, but who testified at length. Thus, no Confrontation Clause issue exists as to him.

[16]Birkhead also overlooks the presence of emergency response personnel at the crime scene and the hospital.

[17]Officer Payne, however, based on his prior experience working for an ambulance service and serving as an army medic, testified Lanier could not have been dead for more

19

the time was provided by police officer(s) "with an eye toward trial[,]" without examining a single officer involved as to whether he or she provided a time of injury or death to any of the persons involved in preparation of the death certificate. *Id*. As Birkhead offers no evidence to support either assumption, we decline his invitation to indulge in such conjecture.[18]

¶39. In a proper case, should evidence be developed that "time of injury," "cause of death," and/or other relevant death-certificate entries were included or influenced by police officers or prosecutors with an eye toward prosecution, a trial judge would not be in error for redacting such. *See* Miss. R. Evid. 102 ("[t]hese rules shall be construed to secure fairness in administration . . . of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."). However, that is not the case before us today.

¶40. The jury was presented with evidence that Officer Parsons arrived on the scene as the nightclub was closing and, while driving through the parking lot, saw Birkhead exit Lanier's vehicle. Officer Payne testified he "was not sure what time he came to the scene"; Officer Myrick testified he did not arrive at the scene until 3:38 a.m. Officer Myrick testified Officer Payne accompanied Lanier to the hospital. Additionally, Officer Payne testified "he had no

---

than five or ten minutes because there was no coagulation of his blood.

[18]Likewise, we decline to indulge the conjecture of the dissent which engages in its own handwriting analysis to suggest that the "Cause of Death" section of the death certificate was completed by the pathologist. (Dissenting Opinion at ¶ 82). Assuming *arguendo* that the pathologist was the source of the "time of injury" entry, he was at trial, available for confrontation, such that no Confrontation Clause issue would exist as to him.

evidence to suggest [Lanier] was not already dead at the time [Birkhead] got into his vehicle."

¶41. While the death certificate is a record of vital statistic, not a business or public record, this Court finds the same sound reasoning of the United States Supreme Court in *Melendez-Diaz* and the Fifth Circuit in *Lopez-Moreno* applies to the case *sub judice*. Under the circumstances of this case, we conclude that the death certificate is a nontestimonial record of vital statistics, "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial[,]" and, therefore, not subject to a Confrontation Clause analysis. *Melendez-Diaz*, 129 S. Ct. at 2539-40. In so holding, this Court does *not* find that testimonial statements, subject to the requirements of the Confrontation Clause, may never be found within a nontestimonial business or public record. As the United States Supreme Court stated in *Melendez-Diaz*, "that is not the case if the regularly conducted business activity is the production of evidence for use at trial." *Id*. at 2538. For example, an affidavit contained within a public record may be deemed testimonial and, therefore, subject to the requirements of the Confrontation Clause.

¶42. Furthermore, "time of injury" was not an essential element of the charge here, factually distinguishing this case from *Melendez-Diaz*, *Davis*, and *Barnette*. *See Melendez-Diaz*, 129 S. Ct. at 2527; *Davis*, 547 U.S. at 829-34 (the victim's written statements in the affidavit given to police were vital to the State's domestic-battery case); *Barnette*, 481 So. 2d at 791 (erroneously admitted certificate of analysis pertained to the nature of the substance, i.e., cocaine, a necessary element for the crime of sale of a controlled substance).

21

¶43. Finally, even assuming *arguendo* that either one of the investigating police officers or the pathologist provided the "time of injury" and/or "time of death" entries with an eye toward trial (of which there is no proof in the record), the putative sources for the information testified live at trial. The record reflects that Birkhead had opportunities to cross-examine the police officers and pathologist to establish his allegation that the "time of injury" and/or "time of death" was provided by one of them. Thus, Birkhead "enjoy[ed] the right . . . to be confronted with the witnesses against him" and, absent his unsupported assertion, no Confrontation Clause violation is present in this case. U.S. Const. amend. VI.

¶44. Accordingly, this issue is without merit.

**IV. Whether the trial court erred in not dismissing a sleeping juror.**

¶45. During the testimony of Investigator Litton, counsel for the State noticed a juror sleeping. Counsel approached the bench and made the judge, as well as defense counsel, aware of the sleeping juror. While this exchange was taking place, the juror awoke. Judge Carey-McCray stated she would have the bailiff get the juror a glass of water and "she would watch him closely." It is not clear whether defense counsel was present during the conference at the bench, as he made no remark or objection.

¶46. While a sleeping juror is a cause for concern, Birkhead goes too far in arguing his case is analogous to ***Church v. Massey,*** where a juror slept through "most of the proceedings." ***Church v. Massey,*** 697 So. 2d 407, 413 (Miss. 1997). The record in this case indicates no further problems with this juror, or any other.

¶47. Furthermore, as the State pointed out, Birkhead failed to raise the issue of the sleeping juror at trial, nor did he raise it in his motion for new trial. "Failure to raise an issue at trial

22

bars consideration on an appellate level." **Walker v. State**, 913 So. 2d 198, 217 (Miss. 2005)

(citations omitted).

**V.      Whether the trial court erred in not declaring a mistrial after a witness's comment regarding Birkhead's exercise of his right to remain silent.**

¶48.    "The standard of review for denial of a motion for mistrial is abuse of discretion."

**Dora v. State**, 986 So. 2d 917, 921 (Miss. 2008) (citations omitted).

¶49.    On direct examination, Investigator Litton testified she took Birkhead to the investigation area.  The following exchange took place in court:

| | |
|---|---|
| State's Counsel: | For what purpose? |
| Investigator Litton: | He was advised of his **Miranda** rights, and he refused to give a statement or say anything. . . . |
| Defense Counsel: | Your Honor, may we approach? |
| Court: | Yes. |

(Conference at the Bench, out of the hearing of the jury)

| | |
|---|---|
| Defense Counsel: | The witness has just testified, I mean in direct violation of this Defendant's constitutional right to remain silent. |
| Court: | I don't know why it was necessary to elicit that testimony. . . .  Well, I don't think it would require a mistrial, but I don't understand why you would elicit that testimony. |
| State's counsel: | I wasn't eliciting it, I was actually asking as far as the -- I thought he was there when they took the pictures. There's pictures of him that's in the investigation division where they took a picture of his pants and they saw the blood on his pants. That's why I was actually looking for the picture so I can take her where I'm trying to go. . . . |
| Court: | I don't remember the question, but I don't think the question lead [sic] there. |
| Defense Counsel: | Your Honor, just for the record, we object to the witness making that statement and we ask for a mistrial. |
| Court: | I'm not going to grant a mistrial, but I'm going to give an instruction right now reminding them that there is a constitutional right to remain silent and that that applies |

at any kind of criminal proceeding and that is not to be used against the defendant or considered against the defendant in any way.

Defense Counsel: Okay.

¶50. The trial judge then gave the following instruction:

[t]his witness has just testified about the defendant's exercise of his constitutional right to remain silent. It's a right that all of us would have if we were criminal defendants in a case, and that is not to be considered against the defendant in any way. It's a right that he has that he can exercise. So I want you to disregard that statement entirely and certainly not give it any consideration or weight in this case.

¶51. Birkhead asserts to this Court that his constitutional right to self-incrimination was violated by the investigator's comment on his choice to remain silent. "In all criminal prosecutions the accused shall . . . not be compelled to give evidence against himself . . . ." Miss. Const. art. 3, § 26; *see also* U.S. Const. amend. V ("[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ."). Birkhead further asserts the jury instruction given by the trial court only emphasized the comment by the investigator.

¶52. "On issues of comments concerning a defendant's failure to testify, each case shall be considered on an individual basis." *Weeks v. State*, 804 So. 2d 980, 993 (Miss. 2001) (citing *Logan v. State*, 773 So. 2d 338, 348 (Miss. 2000) (citing *Conway v. State*, 397 So. 2d 1095, 1099 (Miss. 1980))). This Court recognizes the need to protect the constitutional rights of every citizen, and this Court accepts its charge to preserve these rights. Regarding comments on the failure of a defendant to testify or to remain silent, this Court has stated its position when an instruction is given by the trial court to cure this defect. In *Blue v. State,* this Court held that the effect of a comment by the prosecutor on the failure of the defendant to testify "was corrected by the jury instructions." *Blue v. State*, 674 So. 2d 1184, 1215 (Miss. 1996),

24

*overruled on other grounds by* ***King v. State***, 784 So. 2d 884, 889-90 (Miss. 2001). In ***Strahan v. State,*** this Court ruled the error of the prosecutor's comment on the defendant's right to remain silent was not reversible, as an instruction was given to the jury to ignore the comment. *See* ***Strahan v. State***, 729 So. 2d 800, 807 (Miss. 1998). "This is a very close issue, which involves a fundamental right. . . . However, given the context of the comment and the content of the written instructions, there is no reversible error." ***Id***. ***Blue*** additionally stated, "Instruction CR-1A clearly prohibits the jury from considering comments made by counsel as evidence. It is generally presumed that jurors will obey and apply the instructions of the court." ***Blue***, 674 So. 2d at 1215 (Miss. 1996) (citations omitted).

¶53. Based on the precedent of this Court, the trial court gave a curative instruction, to which the defense did not object. Therefore, there was no abuse of discretion by the trial court resulting in a reversible error.

**VI.     Whether the trial court erred in giving Jury Instruction CR-12 regarding attorney's notes.**

¶54. "When we review a claim of trial court error in granting or denying jury instructions, we are required to read and consider all of the jury instructions together as a whole." ***Richardson v. Norfolk S. Ry. Co.***, 923 So. 2d 1002, 1010 (Miss. 2006) (citing ***Burr v. Miss. Baptist Med. Ctr.***, 909 So. 2d 721, 726 (Miss. 2005)). "No instruction should be taken out of context or read alone in isolation." ***Pierce v. Cook***, 992 So. 2d 612, 625 (Miss. 2008) (citing ***Richardson,*** 923 So. 2d at 1010).

¶55. Based on the transcript, during the course of trial, counsel for Birkhead made notes on witness testimony and displayed these notes on an easel before the jury. The State

objected to defense counsel displaying the notes, because the State felt defense counsel was not writing down testimony verbatim, but was only "highlighting" specific portions of testimony. The trial court stated it found the issue troubling, as the court already had given an instruction to jurors not to look at *each other's* notes. The court took the matter under advisement for further review, and the State again reiterated its objection.

¶56. The next morning, counsel for both parties met in chambers with the trial judge regarding this issue. The trial judge stated:

> [t]his issue of counsel making notes during the testimony, the court believes that, at a minimum, it needs to give an instruction to the jury concerning it. Because it really is fraught with the same types of dangers that the court warned them about in looking at each other's notes, or sharing each other's notes, except that this is more powerful because it's done right there while the testimony is coming out and could be mistaken as evidence.

After further extensive discourse, Judge Carey-McCray stated she would give the limiting instruction when she gave the other instructions, "because I don't want it to seem like I'm admonishing attorneys on either side."

¶57. The trial court then instructed the jury as to the following:

> **Instruction CR-12**: Notes of an attorney are not evidence. An attorney's notes cannot be used to substitute for your independent recollection or judgement [sic] of the evidence.
> When you consider the weight, importance or believability of any part of a witnesses' [sic] testimony, you must not be influenced by the notes taken and displayed to the jury by an attorney during that witness's testimony. An attorney's notes taken and displayed to you during a witness's testimony are not a verbatim record of the full testimony and may exclude evidence you give little importance to or find unbelievable and may exclude information that you give greater weight and find to be credible.
> Thus, do not assume simply because something was written in an attorney's notes that it necessarily took place in court; nor that something did not occur or was not said simply because an attorney did not write in his or her notes.

¶58. On appeal, Birkhead objects to this instruction as giving improper prominence to particular portions of evidence. *See **Sanders v. State,*** 586 So. 2d 792 (Miss. 1991). Birkhead takes issue with the portion, "you may exclude information that you give greater weight and *find to be credible,*" and states the trial court should have stated "some of the things defense counsel had written down *could be* credible."

¶59. However, during the instruction conference, the following exchange took place:

| | |
|---|---|
| Defense Counsel: | And we didn't have any objections to your other instructions. |
| Trial Court: | No objections to the notes or anything, the instructions on the notes? |
| Defense Counsel: | No, your honor. |

¶60. The first time Birkhead raised an objection to this instruction was on appeal. "With few exceptions, this Court has enforced the rule that provides, where no objection is made at trial to an asserted error, a party is procedurally barred from asserting the error on appeal." ***Brown v. State***, 965 So. 2d 1023, 1029 (Miss. 2007) (citing ***Fleming v. State***, 604 So. 2d 280, 294 (Miss. 1992)). Additionally, "[i]t is incumbent on the party asserting error to make a contemporaneous objection and obtain a ruling in order to preserve the objection." ***Id.*** (citation omitted). Thus, Birkhead is now procedurally barred from raising this issue.

**VII.    Whether there was cumulative error which deprived Birkhead of his right to a fundamentally fair trial.**

¶61. According to this Court:

[t]he cumulative error doctrine stems from the doctrine of harmless error, codified under Mississippi Rule of Civil Procedure 61. It holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial.

27

*Ross v. State*, 954 So. 2d 968, 1018 (Miss. 2007) (citing *Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003)).

¶62.   The only error Birkhead identified was Investigator Litton's comment, addressed in Issue V *supra*, which was cured by the court's instruction.  As this error was cured, it does not constitute a basis for reversal.  This Court has stated that:

> upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect.

*Bennett v. State*, 990 So. 2d 155, 161 (Miss. 2008) (citing *Byrom*, 863 So. 2d at 846-47)).

Thus, the issue of the cumulative effect of error on the fairness of Birkhead's trial is without merit.

**CONCLUSION**

¶63.   Accordingly, this Court concludes that Birkhead's conviction and sentence should be affirmed.

¶64.   **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, AS A HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED**.

**CARLSON, P.J., DICKINSON, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. WALLER, C.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED IN PART BY KITCHENS, J. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J.**

**WALLER, CHIEF JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶65. I agree that Birkhead's conviction and sentence should be affirmed. But I disagree with the majority's decision to address the admissibility of certain contents of the death certificate. That issue is procedurally barred because of Birkhead's failure to object to the time of injury or time of death; it should be presented to this Court only as an ineffective-assistance-of-counsel claim in a petition for post-conviction relief. I agree with Justice Kitchens's dissent insofar as he finds the same. I do not join his dissent, however, because I disagree with his analysis of the *Batson* issue.

¶66. For these reasons, I respectfully concur in part and in result.

**KITCHENS, J., JOINS THIS OPINION IN PART.**

**KITCHENS, JUSTICE, DISSENTING:**

¶67. The judgment of the trial court should be reversed due to the trial judge's failure to recognize that defense counsel established a *prima facie* **Batson** challenge during voir dire and due to the trial judge's failure to declare a mistrial after a prosecution witness commented on Birkhead's constitutionally protected silence. Because the majority holds otherwise, I respectfully dissent. I also write to express my disagreement with the majority's analysis of the admissibility of the contents of the death certificate. While I find the issue procedurally barred, the time of death and the time of injury listed on the certificate constitute hearsay that also qualifies as testimonial evidence under our federal and state constitutions' confrontation clauses. U.S. Const. amend. VI; Miss. Const. art. 3, § 26.

*Batson*

¶68. Birkhead's appeal does not present the ultimate question of whether the trial court violated his constitutional rights under **Batson v. Kentucky**, 476 U.S. 79, 106 S. Ct. 1712,

29

90 L. Ed. 2d 69 (1986). Rather, we meet only the preliminary question of whether "all of the circumstances that bear upon the issue of racial animosity," *Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008) (citing *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005)), constituted "a *prima facie* showing that a peremptory challenge has been exercised on the basis of race," *Id.* at 476 (quoting *Miller-El*, 545 U.S. at 277, (Thomas, J., dissenting)). Such determinations are necessarily case specific and will not be overturned on appellate review, absent clear error. *Woodward v. State*, 726 So. 2d 524, 530 (Miss. 1998).

¶69.    But the facts of this case easily clear that high hurdle. When Birkhead lodged his *Batson* challenge, the prosecution had exercised five of its twelve peremptory strikes, and all five had been used against African Americans. If this does not demonstrate the sort of "'pattern' of strikes against black jurors included in the particular venire [that] might give rise to an inference of discrimination," *Batson*, 476 U.S. at 96, then one has a hard time imagining a set of facts that would.[19] *See Flowers v. State*, 947 So. 2d 910 (Miss. 2007) (reversing on *Batson* grounds where prosecutors used 100 percent of their peremptory strikes against African Americans).

---

[19] The majority incorrectly contends that this conclusion cannot be drawn without more information about the makeup of the venire. This argument fundamentally misconstrues the *Batson* process. All that need initially be submitted to the trial court is "a *prima facie* showing that a peremptory challenge has been exercised on the basis of race." *Snyder*, 552 U.S. at 476. If a chance exists that, as the majority implies, the racial makeup of the venire indicates racially neutral reasons for the challenged strikes, then that is a fact to be submitted to the court by the non-challenging party in the second stage of a *Batson* inquiry. Today's case does not ask us to reach this second prong.

¶70. In this case, the prosecutor very well may have been able to articulate reasonable, race-neutral reasons for his peremptory strikes in accordance with the second prong of the *Batson* process, and in light of such explanations, the trial judge could have been within his discretion to deny Birkhead's challenges. However, that is not the question before us. The question is whether Birkhead presented a *prima facie* showing of racially motivated peremptory strikes. I would find that the State's use of each of its first five peremptory challenges against African Americans sufficiently demonstrated such a showing.

*Comment on Defendant's Silence*

¶71. Both the Fifth Amendment to the U.S. Constitution and Article 3, Section 26, of the Mississippi Constitution clearly forbid self-compulsion, a prohibition that "has been construed by this Court to have been violated, not only when a direct statement is made by the prosecution as to the defendant's not testifying, but also by a comment which could reasonably be construed by a jury as a comment on the defendant's failure to testify." *Griffin v. State*, 557 So. 2d 542, 552 (Miss. 1990) (citations omitted). "Simply put, the government cannot use an accused's exercise of a Constitutional right as a weapon to convict him." *Emery v. State*, 869 So. 2d 405, 409 (Miss. 2004) (quoting *Puckett v. State*, 737 So. 2d 322 (Miss. 1999)). In the case at bar, the prosecution witness's reference to Birkhead's post-Mirandized silence clearly commented on the exercise of that right in violation of Birkhead's right to silence under the U.S. and Mississippi constitutions. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶72. Some constitutional errors, in some circumstances, may be deemed harmless. *See Fahy v. Connecticut*, 375 U.S. 85, 86-87, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963). But if a

reviewing court discovers a constitutional error, coupled with a reasonable possibility that the error could have contributed to the conviction, then the error is not harmless. *Chapman v. California*, 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Phrased another way, in order to identify harmless error, an appellate court must determine "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Delashmit v. State*, 991 So. 2d 1215, 1223 (Miss. 2008). Such a determination necessarily requires case-by-case review. *Riddley v. State*, 777 So. 2d 31, 35 (Miss. 2000). In this case, the trial record simply does not reveal the "overwhelming evidence" that sustains a conviction in the face of a constitutional error. *See Williams v. State*, 991 So. 2d 593, 606 (Miss. 2008). To be sure, the State's evidence was strong, but its evidence was purely circumstantial.

¶73. Furthermore, this case is easily distinguished from *Strahan v. State*, 729 So. 2d 800 (Miss. 1998), upon which the majority relies. Maj. Op. at ¶52. In that case, the "very close issue, which involves a fundamental right," was not whether the State's reference to a defendant's silence was cured by a limiting instruction, but rather whether the prosecutor's statement actually was an allegation that the defendant had not presented jurors with a viable case. *Strahan*, 729 So. 2d at 807. In the present case, no such confusion exists. The record leaves no room for doubt that the defendant's constitutionally protected silence was addressed, a clear violation of our rule that "a direct reference to the defendant's failure to testify is strictly prohibited." *Id.*

*Death Certificate*

¶74. My deepest misgiving in this case, though, stems from the majority's analysis of the admissibility of the death certificate.[20] I agree that this point of error does not require reversal, but not because it lacks merit, as the majority holds. We may not reverse on this issue, not because it is meritless, but because the defendant's trial counsel failed to make a proper objection to the evidence and also failed to object to prosecution witnesses' testimony regarding the objectionable evidence – the time of injury and/or the time of death.[21]

¶75. As today's majority opinion recognizes, when the prosecution moved to admit the death certificate, the defense counsel made the following objection: "On the report they have the hour of injury as being 3:38 a.m. I don't know that they have established that. They have the hour of death as being 3:50 a.m. I don't think they have established that. We will object to it being introduced." At no point did the defense attorney object to the contents of the death certificate as hearsay or raise any objection that the admission of the certificate would violate the defendant's constitutional right to confront his accusers. This Court has held that the failure to articulate a specific reason for an objection to the introduction of evidence will waive the issue on appeal. *Duplantis v. State*, 708 So. 2d 1327, 1346-47 (Miss. 1998) (quoting *Norman v. State*, 302 So. 2d 254, 259 (Miss. 1974)).

¶76. There is, of course, a "plain error" analysis, under which this Court may reverse on an issue not otherwise preserved for appeal if there was an error that involved a fundamental right and resulted in a "manifest miscarriage of justice" or "seriously affect[ed] the fairness,

---

[20]The majority opinion devotes two sections of its discussion to the death certificate; but because they are so closely related, I combine these arguments into this one section.

[21]The majority refers mainly to the time of injury in its discussion, but the objection concerned both the time of injury and the time of death listed on the death certificate.

integrity or public reputation of judicial proceedings." ***Brown v. State***, 995 So. 2d 698, 703 (Miss. 2008) (citations omitted). However, throughout the trial, the prosecution elicited significant testimony regarding the victim's time of death without objection from defense counsel.[22] For example, Officer Payne, though not qualified as an expert in such matters, testified that Lanier had died "five to ten minutes" before Officer Payne arrived at the scene. And, although the pathologist, Dr. Steven Hayne, testified at one point that he could not determine a time of death, he also testified that "there was obvious medical intervention on the decedent placed at about the time of death." Dr. Hayne also testified, in response to a line of questioning from the defense attorney, that the victim's external body temperature would have dropped rapidly following death, corroborating Officer Payne's opinion that the victim had died recently because the body was still warm. Given defense counsel's failure to object to the evidence regarding the time of injury and/or death, and the defense attorney's having elicited such information from Dr. Hayne, the admissibility of the contents of the death certificate could be presented to this Court only as an ineffective-assistance-of-counsel claim. We are not presented with such an argument, and this Court has held that ineffective-assistance-of-counsel claims are better presented in petitions for post-conviction relief. ***Archer v. State***, 986 So. 2d 951, 955 (Miss. 2008) (citations omitted).

¶77.   The majority does not make an explicit finding that the issue is procedurally barred, but instead analyzes the merits of Birkhead's argument. I respectfully disagree with this

---

[22]The majority finds in paragraph 20 that "the State never attempted to establish an exact 'time of injury,'" but the record clearly demonstrates that the State was striving to show that the victim's injury and resulting death occurred while Birkhead was in the vehicle.

approach, and would find that the time of injury and the time of death listed on the death certificate constitute objectionable hearsay subject to a state and federal confrontation clause analysis.

¶78. Undoubtedly, as the majority rightly asserts, the death certificate is a self-authenticating document under Mississippi Rule of Evidence 902(4). *See* Maj. Op. at ¶30. The majority also is correct that the death certificate *itself* is excepted from the hearsay rule as a record of a vital statistic under Mississippi Rule of Evidence 803(9). *See* Maj. Op. at ¶31. But these rules establish only that the death certificate is precisely that: a death certificate. When the state registrar certifies a copy of a death certificate, she is certifying only "that the above is a true and correct copy of the certificate on file in th[at] office." Authenticity is not the prime concern here. Admissibility is. The *contents* of the death certificate, however, still are subject to the rules of evidence. Mississippi Rule of Evidence 805 provides, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Unlike, for example, the deceased's name and address which are listed on the death certificate, the time of death and time of injury are "assertion[s]" being "offered in evidence to prove the truth of the matter asserted." M.R.E. 801. Therefore, these "assertions" are hearsay and are "not admissible except as provided by law." M.R.E. 802.

¶79. The majority relies on *Shell v. State*, 554 So. 2d 887, 898 (Miss. 1989), to reject Birkhead's hearsay argument. But, unlike today's case, the defendant in *Shell* did not make an objection to the *contents* of the death certificate; he merely argued that the entire

35

document was inadmissible. *Id.* The Court correctly held that the death certificate itself was not hearsay under Mississippi Rule of Evidence 803(9).

¶80. The majority opinion also rejects Birkhead's reliance on *Flowers v. State*, 243 So. 2d 564 (Miss. 1971), because *Flowers* is a "pre-Rules case" and "old law." Maj. Op. at ¶ 31. However, nothing in Rule 803(9) abrogates the *Flowers* decision. Indeed, the comment to Rule 803(9) specifically recognizes that the rule was a codification of existing law: "This rule is similar to pre-existing Mississippi law. For example, [Mississippi Code Section] 41-57-9 formerly provided for the admission of certified copies of birth and death . . . ."

¶81. When this Court held in *Flowers*, 243 So. 2d at 565, that death certificates could be received into evidence but used only to show the "physical cause of death," this Court was analyzing the same section of the Code mentioned in the comment to Rule 803(9). *See* Miss. Code Ann. § 41-57-9 (Rev. 2009); Miss. Code § 7064 (1942) ("Any copy of the records of birth, sickness or death, when properly certified to [sic] by the state registrar of vital statistics, to be a true copy thereof, shall be prima facie evidence in all courts and places of the facts therein stated.") This statute has existed for nearly a century, and early on this Court rightly recognized, despite the statute's broad language, that not everything listed on the certificate was competent evidence. In *Massachusetts Protective Association v. Cranford*, 137 Miss. 876, 102 So. 171, 172 (1924), this Court held inadmissible a death certificate which stated that the cause of death was "suicidal." The Court reasoned that the death certificate could not be used to prove the insured had committed suicide, a fact that would have relieved the insurance company of its obligation to pay the claim. *Id.* at 173-74. Specifically, this Court held "we do not think the statute was intended to authorize

36

certificates to be introduced as prima facie evidence except as to the prime physical cause of death." *Id.* at 173. Obviously, the Court was not prepared to give validity to every assertion contained in a death certificate, and we should not do so today. While Rule 803(9) provides an exception for the death certificate itself, Rule 805, governing hearsay within hearsay, clearly is applicable to the contents of the death certificate.

¶82. Having established the contents of the document as hearsay, we also are asked to determine whether admission of the contents of the document, without a supporting witness, violated Birkhead's right to confront his accusers. U.S. Const. amend. VI; Miss. Const. art. 3, § 26. As an initial matter, we do not know who supplied the time of death or the time of injury included in the death certificate. The coroner signed the document to certify only that "on the basis of examination and/or investigation, in [his] opinion, death occurred due to the cause(s) and manner as stated." However, his signature appears *above* the section labeled "cause of death." That section was completed by handwritten entries; and while we cannot be certain who completed this portion of the document, the handwriting appears to be the same as that on Dr. Hayne's autopsy report. The "hour of injury" is typed as 3:38 a.m., and the "hour of death" is typed as 3:50 a.m. Coincidentally, more than one officer testified that he arrived on the scene at exactly 3:38 a.m., the precise time listed as the "hour of injury."

¶83. The majority seems to say that Birkhead must provide this Court the identity of the person who supplied the information in order to succeed on a Sixth Amendment claim. Maj. Op. at ¶¶ 38-39. While we cannot know who provided the objectionable information, our ignorance of that person's identity does not change the analysis. Under our state and federal constitutions, the accused has the right "to be confronted with the witnesses against him."

37

U.S. Const. amend. VI; Miss. Const. art. 3, § 26. That the identity of the witness or witnesses remains unknown in this case merely highlights the primary purpose of the constitutional guarantees of the right to confront one's accuser(s): the opportunity to test the validity of the evidence against the accused.

¶84. The majority holds that contents of the death certificate are not subject to a Confrontation Clause analysis because the certificate was "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial." *Melendez-Diaz v. Mass.*, __ U.S. __, 129 S. Ct. 2527, 2539-40, 174 L. Ed. 2d 214 (2009). I respectfully and strenuously disagree. The very existence of Mississippi Code Section 41-57-9 and Mississippi Rule of Evidence 803(9) leaves no room for doubt that the death certificate "would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 52, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).[23]

¶85. The majority also finds it noteworthy that the time of injury "was not an essential element of the charge." Maj. Op. at ¶ 42. I fail to see how this is relevant to a Confrontation Clause analysis. By establishing that Lanier was fatally injured at a time when Birkhead was in Lanier's car, the State was able to show that Birkhead had the opportunity and was the only person who could have killed Lanier. Without a confession or an eyewitness to the

_____

[23]Indeed, quite recently, the United States District Court for the District of Columbia held that, pursuant to *Melendez-Diaz*, admitting a death certificate without a supporting witness would violate a defendants' rights under the Sixth Amendment. *U.S. v. Williams*, __ F. Supp. 2d __, 2010 WL 4071538 (D.D.C. Oct. 18, 2010). The court held that the "death certificate that the government seeks to introduce in evidence in this matter fit[s] squarely within the definition of testimonial statements." *Id* at *2.

murder, the State's case was entirely circumstantial.[24] Thus, if the injury occurred at the same time Birkhead was in Lanier's car, then, logically, either Birkhead stabbed Lanier or Lanier stabbed himself.

¶86. In sum, had the defendant timely and properly objected, the "hour of death" and the "hour of injury" contained in the death certificate would have been inadmissible hearsay with fundamental constitutional implications. The rule enunciated in *Flowers* has not changed with the pronouncement of our rules of evidence or with the United States Supreme Court's latest decisions concerning the Sixth Amendment's Confrontation Clause. Statutes similar to Mississippi Code Section 41-57-9 can be found on the books in many states, but the courts in those states, like ours, historically have refused to hold that the contents of a death certificate qualify as competent evidence merely because they are presented in an official document. As more than one court has said:

> The coupling of hearsay and conclusionary elements in a single piece of evidence arouses the more fundamental problem of fairness to the defendant in a criminal case. The cause of death entry may emanate from a complex value judgment drawn by a medical expert. When it rides into the fray mounted on a saddle of a public document, it is unaccompanied by the expert. The latter appears in court only in the form of the document. He himself is not available for cross-examination by the defense.

*State v. Watson*, 188 S.E.2d 289, 232 (N.C. 1972) (quoting *People v. Holder*, 40 Cal. Rptr. 655 (Cal. Ct. App. 1964)).

*Conclusion*

---

[24]The trial court properly instructed the jury on circumstantial evidence.

¶87. While I agree with the majority, for different reasons, that we cannot reverse based on the admission of the death certificate, I disagree with the opinion's analysis and would reverse the case on other grounds. The trial court committed clear error when it found that Birkhead had not made a *prima facie* **Batson** showing. In addition, the trial court abused its discretion in failing to declare a mistrial after a witness for the State blurted out, in the jury's presence, that the accused had exercised his constitutional right to remain silent. For these reasons, I would reverse the judgment of the trial court and remand the case for a new trial. Because the majority holds differently, I respectfully dissent.

**GRAVES, P.J., JOINS THIS OPINION.**