# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-00253-SCT

*FRANKIE T. JONES a/k/a FRANKIE TERRELL*
*JONES a/k/a FRANKIE JONES*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT | 01/20/2017 |
| TRIAL JUDGE: | HON. JOHN KELLY LUTHER |
| TRIAL COURT ATTORNEYS: | BENJAMIN CREEKMORE |
| | THAD MUELLER |
| | JEFFREY WALDO |
| COURT FROM WHICH APPEALED: | CALHOUN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OTTOWA E. CARTER, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOE HEMLEBEN |
| DISTRICT ATTORNEY: | BENJAMIN CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/06/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. Frankie Terrell Jones was indicted for one count of first degree murder of Billy Ray Covington and one count of felon in possession of a firearm. A Calhoun County jury found Jones guilty on both counts, and the trial court sentenced him as a habitual offender under Mississippi Code Section 99-19-81 to life for the murder conviction and ten years for the felon in possession of a firearm conviction, with the sentences to be served concurrently. Jones appeals. Discerning no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On July 10, 2015, Jones invited Ashley Hobson and her roommate Hannah Walls to his camper trailer in Pittsboro, Mississippi. Jones, who was Hobson's drug dealer, told her he would give her and Walls some drugs and he planned to get more. That evening, Hobson and Walls went to Jones's trailer and spent the evening drinking and getting high. For entertainment, Jones and Walls fired gunshots outside the trailer. Hobson described the gun as black and explained it was not a revolver. Hobson and Walls spent the night at Jones's trailer.

¶3. The next morning, Jones awoke Walls and asked her to take him to Mantee, Mississippi. Walls refused and went back to sleep. Jones then awoke Hobson and asked her to take him to Mantee to get some drugs. Hobson responded that she would if Jones provided gas and allowed her to use the drugs. Hobson told Jones that she had to go to her house to pay rent to her landlord. Jones and Hobson then left in her Nissan Xterra SUV and went to her house, which is near Buck's One Stop, a gas station in Calhoun City.

¶4. Meanwhile that same morning, Marion Armstrong was driving into Calhoun City and saw Covington. Covington flagged down Armstrong and asked him for a ride. Armstrong complied and dropped off Covington at a church near Buck's. Covington was seen on video surveillance walking across Buck's parking lot at 9:54 a.m. Covington was wearing a white shirt, red tennis shoes, and a ball cap.

¶5. Around the same time, Jones and Hobson approached Buck's and Jones spotted Covington. Jones asked Hobson to stop and told her that he owed Covington "some dope."

2

Jones asked Covington if he wanted to ride with them to get some drugs. Covington agreed and got in the back seat. They left and proceeded to County Road 308. While driving, Jones and Covington got into an argument about the drugs that Jones owed Covington. The argument escalated. Jones leaned over the front seat and hit Covington. Hobson told them, "If ya'll are going to fight, get out[.]" Hobson then pulled over on County Road 308. Jones and Covington exited the SUV and fought in the road and on the roadside. During the fight, Covington got on top of Jones, and Hobson told Covington to get off him.

¶6.     Covington got up and began to walk away. The pair continued arguing. Jones became angry and loudly told Covington, "I'm going to kill you. I'm going to kill you." Hobson told Jones, "Come on, let's go." Hobson, who had remained in the driver's seat the entire time, then heard a gunshot. Hobson saw that Jones had shot Covington in the back of the head as he was walking away. At trial, Hobson testified that she saw Jones shoot Covington in the back of the head and identified Jones as the shooter in the courtroom. After Jones had shot Covington, she saw Covington's "knees buckle and him fixing to hit the ground." Hobson then heard at least four more gunshots.

¶7.     Hobson then told Jones to get in the SUV because the police were coming. Jones did so and they went to Hobson's house. Jones told Hobson, "if you be quiet, everything will be okay" and "[y]ou won't end up like Billy Ray [Covington]." After paying Hobson's rent to her landlord, they went to a store and then to Mantee. There, they bought some drugs and then stopped at a liquor store. After buying liquor, Jones and Hobson returned to Jones's trailer. Hobson dropped off Jones and picked up Walls. Hobson and Walls left and went to

3

Grenada to get manicures, to shop, and to get some money from Hobson's child's father. Afterward, they returned to their house.

¶8. When Hobson and Walls arrived at their house, Jones was there. Hobson removed everything from her SUV that could implicate her in Covington's murder, including clothes and CDs. Hobson burned the items she had removed from her SUV in a burn pile in her yard because she was concerned that Covington might have touched something. After burning everything, Hobson left to go to her "sugar daddy's house." On the way, Hobson stopped at a car wash and cleaned the inside of her SUV because she was scared the police might find out what had happened.

¶9. Earlier that same morning, on July 11, 2015, two individuals, who were riding all-terrain vehicles on County Road 308, discovered a body in the ditch alongside the road. The individuals called an emergency medical responder with the local fire department to report the body. The emergency medical responder then called 911 at 10:36 a.m. to report the body. At 10:38 a.m., dispatch for the Calhoun County Sheriff's Office advised Chief Deputy and Investigator Dean Poyner that a body had been found in a ditch on County Road 308.

¶10. Chief Deputy Poyner arrived to the scene and immediately recognized the body as Covington, whom he had known for years. Covington was found dead and lying face down in the ditch, wearing the same clothes and cap that had been depicted in the Buck's surveillance video. Chief Deputy Poyner observed several gun casings around Covington. Covington had seven gunshot wounds, including gunshots to his head, neck, torso, back, and

4

extremities. An autopsy on Covington revealed that the cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶11. Cory Burrow, an investigator with the Mississippi Bureau of Investigation, assisted in the investigation. Investigator Burrow learned that around 10:25 a.m., a witness on County Road 308 had heard approximately six gunshots. Law enforcement developed Jones as a possible suspect. On the day of the murder, Jones voluntarily went to the sheriff's office at approximately 7:00 p.m. and submitted to an interview. Chief Deputy Poynor observed that Jones's left eye was "really bad red." Investigator Burrow also observed that Jones's eye was bruised and bloodshot, which appeared to be a result of a fight. Jones waived his *Miranda*[1] rights and told law enforcement officers that he had been with Hobson earlier that day.

¶12. Law enforcement conducted a series of interviews with Jones over the course of several days. During the investigation, Jones admitted to officers that he owned a .40 caliber pistol. Jones called his mother and informed her where the pistol was located. Chief Deputy Poyner then retrieved the pistol from Jones's mother. Chief Deputy Poynor showed the pistol to Jones. Jones identified the pistol and claimed ownership of it. Because Jones had a prior felony conviction, officers charged Jones with felon in possession of a firearm. Chief Deputy Poynor had the pistol tested, but it did not match the casings found at the crime scene, and it was determined that it was not the murder weapon.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶13.    During the investigation, officers also learned that Jones and Covington had been in an argument days prior to the murder.  Jones informed officers he and Covington were friends, but there had been a bad drug deal between them and he had tried to make it right by giving Covington some better drugs.  Jones admitted that he had purchased a .40 caliber gun on Friday, the day before the murder.  Jones also admitted he owned another small handgun, but he did not know where it was located.  Jones told officers that he had been with Hobson and Walls doing drugs in the hours prior to Covington's death.  Jones also said that, on the morning of Covington's death, he and Hobson had gone to Mantee in Hobson's SUV to buy more drugs.  Jones, however, denied killing Covington.

¶14.    Hobson gave law enforcement two conflicting written statements.  The first statement did not implicate Jones in Covington's murder.  The second did implicate Jones in Covington's murder.  Hobson explained that she had decided to provide more information in her second statement because her conscience was bothering her.  Hobson also explained that she was scared of Jones, who could "be a little crazy."  During the investigation, Chief Deputy Poynor went to Hobson's residence and observed a burn pile beside her house.  Hobson was arrested for having been an accessory after the fact.

¶15.    Jones was indicted for the first degree murder of Covington as well as felon in possession of a firearm.  The jury found Jones guilty on both counts.  The trial court found that Jones was a habitual offender under Mississippi Code Section 99-19-81 (Rev. 2015).  The trial court sentenced Jones as a habitual offender to life for first degree murder and ten years for felon in possession of a firearm.  Jones appeals, raising the following three issues:

6

I.     Whether the trial court erred when it did not sustain Jones's ***Batson***[2] challenge.

II.    Whether the evidence was insufficient to sustain the verdict.

III.   Whether Jones was denied effective assistance of counsel because no cautionary jury instruction regarding accomplice testimony was submitted to the trial court.

## DISCUSSION

### I.     Whether the trial court erred when it did not sustain Jones's *Batson* challenge.

¶16.   The State used its first three peremptory strikes against Juror 5, Shauntika McKinney; Juror 7, Rochelle Glaspie; and Juror 8, Stormy Cruthirds, effectively excluding three out of four potential African-American jurors.  The State used its next two strikes against Juror 12, a Middle-Eastern male named Abdulrahman Alamry, and Juror 13, Amanda Burnett, a white female.

¶17.   After the State tendered twelve jurors to the defense, counsel for the defense objected, stating, "Your Honor, at this time I would like to make a ***Batson*** challenge. We've got five black folks in there, and four of those were struck."  The trial court asked defense counsel to make a record.  Defense counsel pointed out that the State's first strikes were against Jurors 5, 7, and 8, and that each of them was African American.  Defense counsel mistakenly believed the State's fourth peremptory strike was used against an African-American male, Juror 12, Alamry.  However, the clerk and sheriff corrected Jones's counsel, pointing out that Alamry was actually from Yemen.

---

[2]   ***Batson v. Kentucky***, 476 U.S. 79 (1986).

7

¶18.    The trial court, recognizing that the State had struck three out of four potential African-American jurors, requested race neutral reasons for the strikes. The trial court asked if there was any dispute about the numbers. The State responded:

> You know, I don't dispute it. I didn't come in here knowing what their races are with the exception of juror number 5 and juror number 8. I knew that those were African-American individuals just from recollection. I will say that I don't believe a **Batson** pattern has been established, but I do have race neutral reasons for each one of them.

¶19.    The trial court then heard the State's reasons for striking the potential jurors. The State explained:

> According to law enforcement, we have prosecuted many McKinneys, known to be bootleggers; and we asked the question. They didn't respond. Juror number 7, Glaspie, is a common name. We've prosecuted many of those family members. We asked the question. He did not respond. On juror number 8, this is more of his attitude as a juror. When we came in, his body language and the way he communicated, his personality, he had his arms crossed looking at me shaking his head, no; and I just don't feel comfortable allowing a juror with that kind of body language to serve on one of my juries.

¶20.    In response, defense counsel stated:

> Your Honor, it could be just like the Jones[es] and Jones[es]. I don't know if these folks were related. They were asked the question, and they didn't respond. If he wanted to ask them directly, he could have called on that juror number and specifically asked them during the voir dire, and he failed to do that. There was no response on anything from any of these; and three out of four blacks were challenged, Your Honor.

¶21.    The trial court initially did not recall Juror 8 but then agreed with the State's characterization, stating "I don't know if it was so much contempt for the prosecutor, but the whole process. He was not happy to be here and didn't mind people knowing about it,

8

anyway." The trial court found that a pattern had been shown but that the State had offered race neutral reasons for striking Jurors 5, 7, and 8. The trial court continued: "At this time I'm going to allow the State's . . . ."

¶22. The next day, the trial court returned to the *Batson* issue, stating:

> Yesterday in jury selection there was a *Batson* challenge made to the State's jury selection process. At that time I think the record will show that three -- wasn't very deep into the jury selection process; and the State had used three of its challenges to challenge African-American jurors. At that time I found that there was a prima facie case of discrimination, or I don't know the proper word. I had asked the State to provide race neutral reasons for that selection. They did provide race neutral reasons, which I found was acceptable. To make the record complete I want it to show the final makeup of jurors: 14 members, 12 regular jurors and 2 alternates. There are fourteen members on the jury panel, 3 of which are obviously African-American; and I believe my records indicate that of the 14 potential strikes that the State had, 12 on the regular jury panel and 2 on the alternates, is they used 3 of those 14 potential strikes against African-American jurors.

¶23. After the State and defense finally rested, defense counsel renewed its *Batson* challenge. The trial court denied the challenge, explaining:

> The [c]ourt, having made a further record on the *Batson* challenge, indicated that the State was afforded a total of 14 strikes, peremptory strikes, in this case. Three of that 14 were used against African-Americans. The final panel as it was seated included three African-Americans out of the total jury panel. My ruling remains the same on the *Batson* issue.

¶24. On appeal, Jones argues that the State unconstitutionally struck African-American jurors with unsupported claims that they were related to individuals previously prosecuted or convicted of crimes.

### A. Standard of Review

¶25.    "Th[e] Court reviews a trial court's ruling on a *Batson* challenge with great deference and will not overturn the trial court's ruling unless it is clearly erroneous or against the overwhelming weight of the evidence." *Pruitt v. State*, 986 So. 2d 940, 942 (¶ 8) (Miss. 2008).  In *Cox v. State*, 183 So. 3d 36, 52 (¶ 54) (Miss. 2015), the Court explained that when reviewing *Batson* rulings:

> a reversal will only occur if the factual findings of the trial judge appear to be clearly erroneous or against the overwhelming weight of the evidence.  On appellate review, the trial court's determinations under *Batson* are accorded great deference because they are based, in a large part, on credibility.  The term great deference has been defined in the *Batson* context as meaning an insulation from appellate reversal any trial findings which are not clearly erroneous.

*Cox*, 183 So. 3d at 52 (¶ 54) (internal quotations and citations omitted).

¶26.    The Court explained that a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.  *Id*.  The Court recognized that deference to trial court findings on the issue makes particular sense in the *Batson* context because evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial court's province.  *Id*. (citing *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).  Finally, the Court recognized that the United States Supreme Court had added that in the absence of exceptional circumstances, it would defer to the trial court.  *Id.* (citing *Hernandez v. New York*, 500 U.S. 352, 365 (1991)).  "[T]here is a presumption that the judgment of the trial court is correct and the burden is on the Appellant to demonstrate some reversible error to th[e] Court."  *Birkhead v. State*, 57 So. 3d 1223, 1231 (¶ 28) (Miss. 2011) (quoting *Juarez*

10

***v. State***, 965 So. 2d 1061, 1065 (Miss. 2007)); *see also* ***States v. State***, 88 So. 3d 749, 755

(¶ 25) (Miss. 2012) (same).

**B.** ***Batson*’s Three Step Process**

¶27. "The Constitution forbids striking even a single prospective juror for a discriminatory

purpose." ***Foster v. Chatman***, 136 S. Ct. 1737, 1747 (2016) (citing ***Snyder v. Louisiana***, 552

U.S. 472, 478 (2008)). The familiar, three step process for determining whether a strike is

discriminatory under ***Batson*** is well established:

> When addressing a ***Batson*** challenge, a trial court employs a three-step
> procedure: (1) the defendant must make out a prima facie case by showing that
> the totality of the relevant facts gives rise to an inference of discriminatory
> purpose; (2) once the defendant has made out a prima facie case, the burden
> shifts to the State to explain adequately the racial exclusion by offering
> permissible, race-neutral justifications for the strikes; and (3) if a race-neutral
> explanation is tendered, the trial court must then decide whether the opponent
> of the strike has proved purposeful racial discrimination. *The burden remains*
> *on the opponent of the strike to show that the race-neutral explanation given*
> *is merely a pretext for racial discrimination.*

***Pruitt***, 986 So. 2d at 942–43 (¶ 8) (internal citations omitted) (emphasis added);

**1.** **Prima Facie Case**

¶28. Here, the State used its first five peremptory strikes to exclude three potential African-

American jurors. After the State tendered twelve potential jurors to the defense, defense

counsel made a ***Batson*** challenge, contending that the State had struck three out of four

potential African-American jurors. The trial court then stated that it would hear the State's

race neutral reasons for the strikes, and the State provided its reasons. The Court has found

that "[o]nce reasons are offered by the proponent, the issue of whether a prima facie case of

discrimination has been developed is moot." ***Berry v. State***, 802 So. 2d 1033, 1037 (Miss.

11

2001) (citations omitted); *see also* **Hernandez v. New York**, 500 U.S. 352, 355-59 (1991).

Because the trial court heard the State's race neutral reasons for the challenged strikes and

because the State provided race neutral reasons, the issue of whether a prima facie case was

shown now is moot. We proceed to the second step.

### 2. Race Neutral Reasons

¶29. "[O]nce the defendant has made out a prima facie case, the burden shifts to the State

to explain adequately the racial exclusion by offering permissible, race-neutral justifications

for the strikes. . . ." **Pruitt**, 986 So. 2d at 942–43 (¶ 8). The Court has explained:

> The second step of the process does not demand an explanation that is
> persuasive, or even plausible. At this second step of the inquiry, the issue is
> the facial validity of the prosecutor's explanation. Unless a discriminatory
> intent is inherent in the prosecutor's explanation, the reason offered will be
> deemed race neutral.

**Lynch v. State**, 877 So. 2d 1254, 1271 (¶ 49) (Miss. 2004) (quoting **Randall v. State**, 716 So.

2d 584, 588 (¶ 16) (Miss. 1998)).

¶30. The Court has recognized that the criminal history of a potential juror's family

member is a race neutral reason for exercising a peremptory strike. *See* **Pitchford v. State**,

45 So. 3d 216, 227 (¶ 24) (Miss. 2010); **Lynch**, 877 So. 2d at 1271-72 (¶ 51). In addition,

federal courts have held that exercising a peremptory strike on a juror with the race neutral

reason that the juror shares a last name with persons prosecuted in the past passes muster

under **Batson**. *See* **United States v. Bynum**, 3 F.3d 769, 772 (4th Cir. 1993) (affirming

district court's rejection of **Batson** challenge where the prosecutor's explanations were that

a venireperson had the same last name as someone the prosecutor had prosecuted from the

same town; that a venireperson was unemployed and had trouble with transportation to court; and that a venireperson was a young, single mother who might be too sympathetic with the defendant); *United States v. Terrazas-Carrasco*, 861 F.2d 93, 94-95 n.1 (5th Cir. 1988) (listing the fact that the prospective juror had "the same last name as someone previously convicted by the prosecutor" as one of a number of grounds for valid peremptory challenges). Because the State's given reasons for striking Jurors 5 and 7 were race neutral, we proceed to *Batson*'s third step.

### 3. Pretext

¶31. "After a race-neutral explanation has been given, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory, *i.e.*, that the reason given was a pretext for discrimination." *Flowers v. State*, 947 So. 2d 910, 917 (Miss. 2007).

¶32. The final step of *Batson* "involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)); *see also Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008). The Court, consistent with courts throughout the United States (both state and federal), invariably has held that the burden of proof remains on the opponent of the strike to show that the race neutral explanations given were merely a pretext for racial discrimination. *See Lynch*, 877 So. 2d at 1272 (¶ 52) ("In determining whether a race-neutral explanation is pretextual, the *burden remains with the opponent of the strike*.")

13

(emphasis added); *see also* **Hardison v. State**, 94 So. 3d 1092 (Miss. 2012). To be sure,

Jones acknowledges in his appellant's brief that after a race neutral explanation has been

provided, "[t]he trial court must then determine whether the *objecting party has met his*

*burden* of proving the reasons given for the strikes were actually pretexts for discrimination."

¶33.    The Court has identified five indicia of pretext for use in analyzing a proffered race

neutral reason for peremptory strikes under **Batson**:

> (1) disparate treatment,[3] that is, the presence of unchallenged jurors of the
> opposite race who share the characteristic given as the basis for the challenge;
> (2) the failure to voir dire as to the characteristic cited; (3) the characteristic
> cited is unrelated to the facts of the case; (4) lack of record support for the
> stated reason; and (5) group-based traits.

**Lynch**, 877 So. 2d at 1272 (¶ 52).

¶34.    Jones argues that the State's use of two of its peremptory strikes on African-American

Jurors 5 and 7 because it suspected that they were related to individuals whom the State

previously had prosecuted was clearly a pretext for discrimination. Jones contends that the

State did not question the potential jurors about their family relationships, and there was no

proof that they were related to the individuals referenced by the State.

---

[3] The dissent suggests that disparate treatment of similarly situated jurors occurred in the case *sub judice* because potential jurors Sherry Williams and Ernie Doss both answered that they had family members prosecuted more than twenty years ago. Both Williams and Doss stated that their connections would not make it difficult to serve, and that they could be fair and impartial. The State tendered Williams and Doss, but they were struck peremptorily by the defense. Disparate treatment is defined as the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge. **Flowers**, 947 So. 2d at 917 (¶ 9). Because the record does not reflect the races of Williams or Doss, we are unable to conclude that disparate treatment occurred. *See* **Birkhead**, 57 So. 3d at 1231 (¶ 27) ("The burden falls upon an appellant to ensure the record contains sufficient evidence to support his assignments of error on appeal.").

¶35.    Jones's contentions miss the mark.  First, the State asked the venire whether any of them had a close, personal friend or family member who had been charged with a crime. When asked to provide race neutral reasons for its peremptory strikes, the State explained that part of the reason for exercising the strikes for Jurors 5 and 7 was that they had not answered the question.  Second, there was no undisputed evidence that the jurors were not related.

¶36.    In *Pruitt*, the defendant argued that the record lacked support that the jurors were related to individuals prosecuted by the county.  *Pruitt*, 986 So. 2d at 944 (¶ 16).  The Court held that, although lack of record support is one indication of pretext, the basis for the prosecutor's strike need not be in the record.  *Id*. at 945 (¶ 19).  The Court continued:

> [w]e decline to set any limits on the prosecutor's use of any legitimate informational source heretofore or hereafter available as to jurors. Furthermore, the prosecutor does not have to question a juror in open court about such information before using it as a racially neutral ground to make a peremptory strike, as long as the source of the information and the practice itself are not racially discriminatory.

*Pruitt*, 986 So. 2d at 945 (¶ 19) (holding that the arguments concerning lack of record and failure to voir dire are insufficient to overcome the deference the Court gives to the trial court with regard to its ruling on a *Batson* challenge).

¶37.    Here, the State based its reasoning for striking Jurors 5 and 7 on personal knowledge and information gained from law enforcement.  The defense, which had been tasked with the burden of proof, simply responded to the State's race neutral reasons by saying:

> Your Honor, it could be just like the Jones[es] and Jones[es].  I don't know if these folks were related.  They were asked the question, and they didn't respond.  If he wanted to ask them directly, he could have called on that juror

15

number and specifically asked them during the voir dire, and he failed to do that. There was no response on anything from any of these; and three out of four blacks were challenged, Your Honor.

¶38. The trial court did not prevent defense counsel from offering proof to show pretext in any way. In lieu of offering proof, defense counsel offered a mere cursory response, confirming that he did not know if the potential jurors were related to individuals who had been prosecuted in the past. Defense counsel obviously had the idea that questioning the jurors individually might be prudent but did not do so. If defense counsel truly had believed that the State's race neutral reasons were unfounded and merely pretext, he had the opportunity to offer proof in rebuttal. *See* ***Birkhead***, 57 So. 3d at 1231 (¶ 27) (the burden is on the appellant to ensure the record contains sufficient evidence to support his assignment of error on appeal). Most importantly, the relevant inquiry at the third step of the ***Batson*** process is not whether the State disproves pretext; rather, it is whether the opponent of the strike has met its burden of proving pretext.

¶39. The dissent's argument relies on characterizing the above-quoted statement by defense counsel as a rebuttal to the State's proffered race neutral reason, but the statement is no rebuttal of anything. Counsel for the defense asserted no facts or even argument. The statement fairly can be characterized as containing no positive assertions to contradict the State's proffered reason; defense counsel essentially stated that he did not know any pertinent information. To rebut something, one must "refute, oppose, or counteract (something) by evidence, argument, or contrary proof. . . ." *Rebut*, Black's Law Dictionary (9th ed. 2010). Defense counsel's statement of a lack of knowledge refutes nothing.

16

¶40.    In *Chamberlin*, the Court wrote that because the objector failed to offer any proof that the State's reasons were pretextual, the State's reasons for the challenges were the only considerations before the trial court. *Chamberlin*, 989 So. 2d at 339 (¶ 68). In the absence of rebuttal by the challenging party, the trial court is limited to the reasons proffered by the party exercising the peremptory strike. *Lynch*, 877 So. 2d at 1271 (¶ 49).

¶41.    The Court of Appeals has rejected the same arguments raised by Jones today. *See Jackson v. State*, 5 So. 3d 1144 (Miss. Ct. App. 2008); *see also **Clay v. State***, 881 So. 2d 354, 356-57 (¶¶ 5-12) (Miss. Ct. App. 2004). In *Clay*, defendant William Henry Clay, a black male, argued that the State unlawfully and systematically had excluded four potential black jurors from the venire with all four of its peremptory strikes. *Id*. at 356 (¶ 5). The trial court ruled that Clay had made a prima facie case. *Id*. at 357 (¶ 7). On appeal, Clay argued that "the race-neutral reasons supplied by the State in excusing these four potential black jurors were inadequate and incorrect, and no outside proof was offered to substantiate the reasons." *Id*. at 356 (¶ 5). The Court of Appeals summarized the State's race neutral justifications and the trial court's determinations as follows:

> The prosecution's first peremptory challenge was exercised against juror number twenty-two, Willie B. Nance. The prosecution stated that it had prosecuted many defendants and convicted several in the area with the last name Nance. After hearing these reasons the judge recalled hearing two cases of a person named Nance being prosecuted and found that this was a race-neutral justification for the exercise of the peremptory strike.
>
> The second peremptory challenge was used against juror number twenty-four, Melissa Randle. The prosecution stated that its reasoning for striking Randle was the same as before, that it had prosecuted many Randles and that Ms. Randle had not answered the jury questionnaire about her family. The judge then requested the names and numbers of Randles prosecuted by the district

17

attorney's office but the question could not be answered sufficiently. The judge ruled the reason was sufficiently race neutral to survive a *Batson* challenge, but that he could not rule on the reason's truthfulness.

The third peremptory challenge was used against juror number thirty-five, Travis Ledbetter. The prosecution again mentioned a previous prosecution of a Ledbetter, specifically Charles Ledbetter. Apparently, Charles is an infamous character to the judge because during Charles'[s] prosecution he made accusations against the judicial system, the district attorney's office and the court. Charles and Travis are related and the judge quickly ruled this was a race-neutral strike.

The fourth and final peremptory challenge was used to strike juror number forty-two, Marie Hairston. The prosecution struck her because she was currently unemployed, it had prosecuted persons with her last name before, and she had failed to answer the question on her family when asked in the questionnaire. The judge found that the juror being unemployed was a sufficient race-neutral reason to strike Ms. Hairston.

*Clay*, 881 So. 2d at 357 (¶¶ 8-11).

¶42.    The Court of Appeals held that the factual findings of the trial court were not clearly erroneous or against the overwhelming weight of the evidence, and that Clay had presented insufficient evidence that the trial court had acted erroneously in allowing the prosecution's peremptory challenges to stand. *Id*. at 357 (¶ 12).

¶43.    In another factually similar case, the Court of Appeals wrote that "we will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence." *Williams v. State*, 903 So. 2d 752, 754 (¶ 5) (Miss. Ct. App. 2005) (citing *Manning v. State*, 765 So. 2d 516, 519 (¶ 8) (Miss. 2000)). In *Williams*, the Court of Appeals held:

During voir dire, the State exercised one of its peremptory challenges against an African-American venireman. Defense counsel objected based on *Batson* and argued that a prima facie case that race was the criteria for the State's

18

challenge had been shown. Williams was a member of a cognizable racial group and several members of his race had been excluded as veniremen. Williams maintained that those facts created an inference that the State used its peremptory challenges to strike African-Americans. In response, the prosecutor explained that a defendant with the same last name as the venireman had recently been indicted on armed robbery and for this reason the State had exercised one of its peremptory challenges. The trial judge considered the State's explanation of the strike and found it to be racially neutral. The trial judge explained that the last name was an "unusual name" and "were this a common name, that might be a different situation." We place our trust in trial judges to determine whether or not a discriminatory motive underlies the prosecutor's articulated reason. *Lockett v. State*, 517 So. 2d 1346, 1352 (Miss. 1987). The defense did not offer any evidence or argument to rebut the State's race-neutral explanation. We find no error in the trial judge's decision to sustain the State's peremptory challenge.

*Williams*, 903 So. 2d at 754 (¶ 6).

¶44. We likewise hold that the trial court's finding that the defense failed to demonstrate pretext was not clearly erroneous or against the overwhelming weight of the evidence based on the record. Accordingly, we hold that Jones's response to the State's race neutral reasons was insufficient to overcome the deference we give the trial court with regard to its *Batson* rulings.

## II. Whether the evidence was insufficient to sustain the verdict.

¶45. "The sufficiency of the evidence is challenged with a motion for a directed verdict, a request for a peremptory instruction, or a motion for judgment notwithstanding the verdict (JNOV)." *Pace v. State*, 242 So. 3d 107, 117 (¶ 24) (Miss. 2018). "On review of the sufficiency of the evidence, th[e] Court considers the trial court's ruling at the last time the sufficiency of the evidence was challenged." *Warren v. State*, 187 So. 3d 616, 627 (¶ 30) (Miss. 2016). After conclusion of all testimony, Jones renewed his motion for a directed

19

verdict. The trial court denied the motion; therefore, we consider whether the trial court erred by denying Jones's renewed motion for a directed verdict.[4]

¶46. "When th[e] Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶ 25) (Miss. 2017). The Court has explained:

> The Court does not determine whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Further, if the facts and inferences point in favor of the defendant on any elements of the offense with sufficient force, that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render. However, the evidence is sufficient if, keeping in mind the beyond-a-reasonable-doubt burden of proof standard, reasonable men, exercising impartiality, might be led to different conclusions on every element of the offense.

*Bowser v. State*, 182 So. 3d 425, 430 (Miss. 2015) (internal quotations and citations omitted).

¶47. Jones argues that the evidence was insufficient to support the verdict because the State's theory of the case was based on evidence that was "fanciful, farfetched[,] and unreasonable." Specifically, Jones argues that, although Buck's surveillance video captured Covington walking past the store's gas pumps at 9:54 a.m., the State did not produce Buck's surveillance video capturing Hobson's SUV passing by the store. Jones argues that the video should have captured Hobson's SUV because she had indicated in a statement that she had passed by Buck's at 9:56 a.m. Because the surveillance video shown at trial did not show

---

[4] Jones does not challenge the sufficiency of the evidence for his felon in possession of a firearm conviction.

20

Hobson's SUV passing by Buck's and picking up Covington, Jones contends that the evidence is insufficient to support the first degree murder verdict. Essentially, Jones's position is that, because surveillance video should have captured Hobson's SUV at some point on the morning of the murder, Hobson's account of the murder was impossible.

¶48. Jones was indicted for first degree murder in violation of Mississippi Code Section 97-3-19(1)(a). Section 97-3-19 defines first degree murder as follows: "The killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder[.]" Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). Therefore, the State was required to prove that Jones (1) killed Covington, (2) without the authority of law, and (3) that he did so with deliberate design to effect his death.

¶49. Hobson testified that on the morning of July 11, 2015, she and Jones were in her SUV on the way to her house, which is near Buck's. While Hobson provided a statement that she had passed by Buck's at 9:56 a.m., she also testified that Jones spotted Covington at Buck's as they passed by around 9:40 a.m. or 9:50 a.m. Hobson testified that he told her to pick up Covington because he owed him "some dope." Hobson testified that Covington got in the back seat and they proceeded to County Road 308.

¶50. Hobson testified that Jones and Covington then began to argue about a previous drug deal. Hobson testified that the argument escalated, and that Jones punched Covington in the back seat. Hobson testified that she pulled over on County Road 308 and Jones and Covington exited the SUV. Hobson testified that the men proceeded to fight, and that

21

Covington ended up on top of Jones. Hobson testified that Covington got off of Jones and began to walk away. Hobson testified that Jones yelled at Covington, "I'm going to kill you. I'm going to kill you." Hobson testified that she heard a gunshot and saw Jones shoot Covington in the back of the head. Hobson testified that she saw Covington's knees buckle and that she saw him hit the ground. Hobson testified that she heard at least four more gunshots. Hobson testified that they left the scene after Covington had hit the ground.

¶51. Hobson's testimony was corroborated at trial. Two individuals riding all terrain vehicles on Count Road 308 discovered a body lying face down in the ditch by the roadside. Chief Deputy Poynor testified that he had responded to the scene and had identified the body as Covington. An individual also informed law enforcement that several gunshots had been fired that morning on County Road 308. Deputy Chief Medical Examiner for the State of Mississippi John Brently Davis testified as an expert in the area of forensic pathology. Deputy Chief Davis testified that Covington had suffered a total of seven gunshot wounds. Deputy Chief Davis opined that the cause of Covington's death was multiple gunshot wounds and the manner of death was homicide.

¶52. Chief Deputy Poynor corroborated Hobson's account regarding a previous bad drug deal between Jones and Covington. Chief Deputy Poynor testified that Jones had told him there had been a bad drug deal between him and Covington. Chief Deputy Poynor testified that Jones had "tried to make it right" with Covington "by giving him some better dope."

¶53. Chief Deputy Poynor testified that Jones's eye was red and inflamed when he interviewed Jones the day of the murder. Investigator Burrow also testified that he had

observed Jones's eye was bruised and bloodshot, apparently the result of a fight. Glenda Armstrong, who lived on the same lot as Jones, testified that she had seen him the night before the murder and in the early morning hours on the day of the murder. Glenda Armstrong testified that she did not notice anything wrong with Jones's eye at the time. After the murder, Glenda Armstrong testified that she had noticed Jones's eye was red and asked him what had happened. Glenda Armstrong testified that Jones had responded, "Me and Billy got into an altercation."

¶54. The jury is the sole judge of the credibility of witnesses, and its decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict. *Bowser*, 182 So. 3d at 30 (¶ 12). Similarly, the jury is the sole judge of the weight and worth of witnesses' testimony. *Lenoir v. State*, 222 So. 3d 273, 279 (¶ 29) (Miss. 2017). It also is within the jury's province to draw reasonable inferences from facts based on experience and common sense. *Bowser*, 182 So. 3d at 30 (¶ 12). Here, the jury obviously found Hobson's testimony that Jones had shot Covington following a fight on County Road 308 to have been credible.

¶55. The purported timestamp discrepancy and absence of Hobson's SUV on Buck's surveillance video are relevant only to the weight and worth of the evidence, which is solely within the jury's province. The purported timestamp discrepancy and absence of Hobson's SUV on Buck's surveillance video do not affect the essential elements of first degree murder. Put simply, whether Jones murdered Covington on County Road 308 does not turn on precisely what time or where Hobson and Jones picked up Covington.

23

¶56.   Even so, the inconsistencies now alleged by Jones were developed at trial and squarely presented to the jury for factual resolution.  Sheriff Greg Pollan testified that the timestamp on Buck's surveillance video was anywhere between three to five minutes off.  Chief Deputy Poynor was specifically asked why Hobson's SUV did not appear on the video; he explained:

> Q.   If they picked him up over here, if they were going on 308 over here, that vehicle would have had to come in front of that camera to go down 308; is that correct?
>
> A.   I don't know why that video is cutting off where it did; but in the video that we watched it may be the one that's down below -- you see Billy Ray turn around real fast and come back in front of Buck's.
>
> . . .
>
> Q.   So if he came from Calhoun City toward Bruce in the 27 video, if he was picked up in Ashley's vehicle, that vehicle would have had to come in front of that video, wouldn't it?
>
> A.   Yes, sir.
>
> Q.   And you don't have a video of that vehicle, do you?
>
> A.   At the time the videos were being made we didn't know what we was looking for. We was mainly concerned with Billy Ray.
>
> . . .
>
> Q.   Now, did you go back to the store after you felt like that Frankie was a suspect to see if any prior footage or footage after this incident would have showed that vehicle?
>
> A.   No, sir.

¶57.   "[T]he jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness." *Young v. State*, 236 So. 3d 49, 57 (¶ 35) (Miss. 2017).  A jury's resolution of factual determinations must be respected

24

where, after reviewing all the evidence in the light most consistent with the jury's finding, the Court concludes that sufficient evidence supported the finding. *Lenoir*, 222 So. 3d at 279 (¶ 29).

¶58. Considering the evidence in the light most favorable to the State, the essential elements of first degree murder could have been found by a rational juror based on the evidence presented at trial. Accordingly, we hold that sufficient evidence of first degree murder exists, and that the present assignment of error is without merit.

### III. Whether Jones was denied effective assistance of counsel because no cautionary jury instruction regarding accomplice testimony was submitted to the trial court.

¶59. Jones argues that he was denied effective assistance of counsel because his trial counsel did not present a cautionary accomplice testimony jury instruction to the trial court regarding Hobson's testimony. In support, Jones argues that Hobson was an accomplice who provided the only evidence that linked him to Covington's murder. Jones argues that he was entitled to a cautionary instruction because Hobson's testimony was uncorroborated. Jones claims he was severely prejudiced by his counsel's failure and the outcome would have been different had the jury been instructed to view accomplice testimony with great caution and suspicion.

¶60. "Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Johnson v. State*, 235 So. 3d 1404, 1413 (¶ 29) (Miss. 2017) (quoting *Archer v. State*, 986 So. 2d 951, 955 (¶ 15) (Miss. 2008)). A claim of

25

ineffective assistance of counsel may be raised on direct appeal "if such issues are based on facts fully apparent from the record." Miss. R. App. P. 22(b).

¶61. "Whether to request a certain instruction generally is a matter of trial strategy." *McCoy v. State*, 147 So. 3d 333, 347 (¶ 36) (Miss. 2014). In *McCoy*, the Court dismissed the defendant's ineffective assistance claim regarding his attorney's failure to request a cautionary instruction without prejudice so that he might raise the claim in a properly filed motion for post conviction relief. *Id*. The Court explained that, if the defendant's trial attorney intentionally failed to request a cautionary instruction regarding an accomplice's testimony, she may have done so as part of her trial strategy. *Id*. The Court wrote that post conviction proceedings would give the defendant's trial attorney a fair opportunity to explain any possible strategy in forgoing such an instruction. *Id*.

¶62. As in *McCoy*, we dismiss without prejudice Jones's ineffective assistance of counsel claim regarding his trial attorney's failure to request a cautionary instruction. He may raise the claim in a properly filed motion for post conviction relief.

CONCLUSION

¶63. For the foregoing reasons, we affirm the judgment of the trial court.

¶64. **AFFIRMED.**

**RANDOLPH, P.J., MAXWELL, BEAM AND CHAMBERLAIN, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., KITCHENS, P.J., AND ISHEE, J.**

**KING, JUSTICE, DISSENTING:**

¶65.    The Court today strikes a great blow to the progress this State has made in eliminating discrimination from the jury-selection process.  During the jury-selection process for Frankie Terrell Jones's trial, the State used four of its first five peremptory strikes to eliminate three potential African American jurors and one Middle-Eastern juror. The defense raised a *Batson* challenge.[5] When asked for its race-neutral reasons for the first two peremptory strikes, the State responded that law-enforcement officers had informed the prosecution that people with the same last name previously had been prosecuted in that county. Counsel for the defense rebutted the State's explanations, arguing that the State had not alleged that these previously prosecuted persons were of any relation to the two potential jurors and had not attempted to voir dire the potential jurors. Yet, without requiring verification or inquiring if the potential jurors were related to those people, the trial court, and now this Court, found no issue with the vague and unsupported explanations offered by the State.

¶66.    After the defense raised a *Batson* challenge, the trial court initially found that a prima facie case of discrimination had been shown. The second step in *Batson* requires the State to offer race-neutral justifications for the strikes. "[O]nce the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible, race-neutral justifications for the strikes. . . ." *Pruitt v. State*, 986 So. 2d 940, 942–43 (Miss. 2008). When asked for a race-neutral reason for its strikes, the State replied [in reference to Jurors 5 and 7]:

> According to law enforcement, we have prosecuted many McKinney's [sic], known to be bootleggers; and we asked the question. They didn't respond.

---

[5]*Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Juror number 7, Glaspie, is a common name. We've prosecuted many of those family members. We asked the question. He did not respond.

This Court previously has held that the actual criminal history of a potential juror's family member may be considered a race-neutral reason for exercising a peremptory strike. *Pitchford v. State*, 45 So. 3d 216, 227 (Miss. 2010).[6] However, the court's inquiry does not end there. The court has an obligation to move to the third step, which is to determine whether what is at least facially a race-neutral reason, is not being embraced as a pretext to mask active racial discrimination.

¶67.    "After affording the defendant an opportunity to rebut, the trial court should proceed to the third step of *Batson* and determine whether or not the opponent of the strike has proven intentional discrimination." *Thorson v. State*, 721 So. 2d 590, 593 (Miss. 1998) (citing *Batson*, 476 U.S. at 98). Black's Law Dictionary defines "pretext" as "a false or weak reason or motive advanced to hide the actual or strong reason or motive." *Pretext*, Black's Law Dictionary (10th ed. 2014).  Counsel for Jones rebutted the State's proffered reasons for the challenged strikes, stating:

> Your Honor, it could be just like the Jones[es] and Jones[es]. I don't know if these folks were related. They were asked the question, and they didn't respond. If he wanted to ask them directly, he could have called on that juror number and specifically asked them during voir dire, and he failed to do that. There was no response on anything from any of these; and three out of four blacks were challenged, Your Honor.

---

[6]Defense counsel states that, although he believes that the State's strike of Juror 8 was racially motivated, he "concedes that evidence in the record is sufficient to support the trial court's ruling with regard to this juror." Counsel for defense also believes that the State's use of a peremptory strike against Juror 12, Alarmry, was racially motivated but conceded that the ruling on that objection was not pursued.

Regardless, the trial court then accepted the State's proffered reasons as race-neutral without further inquiry or verification.

¶68.    This Court previously has held the lack of record support for a proffered reason to be indicative of pretext. *Flowers v. State*, 947 So. 2d 910, 924-25 (Miss. 2007). The failure to voir dire also is indicative of pretext. *Id.*; *see also Mack v. State*, 650 So. 2d 1289, 1299 (Miss. 1994) ("The trial court correctly rejected the challenge to Terrell based upon a suspected relationship, observing that the prosecutor could have raised the issue on *voir dire*."). In *Flowers*, the State struck juror Vickie Curry, listing four reasons for the peremptory strike: Curry worked with the defendant's sister; she had problems with the death penalty; one of the State's investigators personally had run-ins with Curry's husband; and her husband had been convicted of burglary of a nursing home. *Flowers*, 947 So. 2d at 923. This Court found probative that the only support for the State's contention that Curry's husband had been convicted of a crime was the State's bare assertion that its investigator had stated this. *Id.* at 925. Because the contention lacked record support and because the State failed to voir dire the juror, this Court found that strike was indicative of pretext. *Id.* at 925.

¶69.    This Court went on to state that the bald assertion did not, in and of itself, necessitate a finding that a *Batson* violation had occurred. *Id.* However, this Court stated, "because two of the State's four grounds for striking Curry have no basis in the record, and Curry was treated disparately from a similarly situated white juror on the third ground, we are convinced that the trial court erred in denying Flowers's *Batson* challenge as to the striking of Curry, as this ruling is against the overwhelming weight of the evidence in the record." *Id.* at 926.

29

¶70. Conversely, this Court has upheld the trial court's acceptance of a peremptory strike after the trial court required verification of the prosecution's assertion that a potential juror's family members had been prosecuted. *Snow v. State*, 800 So. 2d 472, 479 (Miss. 2001), *declined to follow by Flowers v. State*, 947 So. 2d 910 (Miss. 2007). In *Snow*, the prosecutor offered as a race-neutral reason for striking a potential juror that he had information that a number of the potential juror's family members had been arrested and convicted and that the juror had complaints from writing bad checks. *Id.* The trial court then required two members of the District Attorney's Office to verify the prosecutor's statement. *Id.* at 481. This Court stated, "[t]he trial court thoroughly investigated the race-neutral reason in order to make a determination of whether or not the reason was pretextual and concluded that this reason was clearly supported from the testimony of the investigator." *Id.* at 483.

¶71. Here, unlike in *Flowers* and *Snow*, the State offered no additional explanations for striking Jurors 5 and 7. The State's sole reason was that people with the same last name had been prosecuted previously. The State failed to specify whether or not those people who had been prosecuted were related to either juror. In addition, the State provided far less information for its peremptory strikes than it did in *Flowers*. In *Flowers*, the State provided a specific example of why it had used a peremptory strike against the potential juror–that the juror's *husband* had been convicted criminally and had problems with the law. If the State had been aware of a familial relationship in this case, it offered no indication of who in the McKinney or Glaspie family had been prosecuted or at what point in time the family member had been prosecuted. If McKinney's or Glaspie's distant cousin had been prosecuted twenty

years ago, it likely would have no effect on her fitness as a juror today. "[T]he prosecutor must give a 'clear and *reasonably specific*' explanation of his 'legitimate reasons' for exercising the challenges." ***Batson***, 476 U.S. at 98 n.20 (emphasis added). Here, the prosecution merely painted with a broad brush, stating that individuals with the same surname had been prosecuted. Its reasons were neither clear nor reasonably specific.

¶72.    The majority takes issue with Jones's arguments that the State had not questioned the potential jurors about family relationships and that no proof existed that the potential jurors were related to the individuals referenced by the State. To justify those strikes, the majority writes:

> First the State asked the venire whether any of them had a close, personal friend or family member that had been charged with a crime. When asked to provide race-neutral reasons for its peremptory strikes, the State explained that part of the reason for exercising the strikes for Jurors 5 and 7 was because they had not answered the question. Second, there was no undisputed evidence that the jurors were not related.

During voir dire, the State questioned the collective jury pool, asking:

> The next question is about whether any of you have been charged with a crime or close, personal friends, or family members that have been charged with a crime; and the judge kind of went over this a little bit. We're not talking about misdemeanor stuff, DUI; and I always like to say that we all have members of our families, you know, the black sheep of the family. Even in my own family people have been charged with crimes. They are all on my wife's side. **But anybody have any close, personal friends that have been charged with crimes?**

(Emphasis added.) "Disparate treatment of similarly situated jurors is an indicator of pretext for racial discrimination." ***Flowers***, 947 So. 2d at 921. Out of the collective jury pool, only five potential jurors responded in the affirmative: Jurors 13, 17, 48, 52, and 63. Out of those

five, the State tendered the jury pool before it reached jurors 52 and 63. Therefore, the State had the opportunity to strike three potential jurors that had responded affirmatively that they had family members who had been charged with a crime. The State tendered two of those three jurors. State accepted Juror 17, Sherry Williams, who had a cousin who had been prosecuted in the same county. The State also accepted Juror 48, Ernie Doss, who had a family member convicted of a felony in the same area. Yet, although Jurors 5 and 7 had not indicated that they were related to or had any close personal friends that had been charged with a serious crime, instead of giving credence to the potential jurors or questioning those jurors further, the State, the trial court, and now the majority presume that only the two African American jurors were untruthful in their silence.

¶73.    Moreover, I note that, although the prosecution made lengthy prefatory remarks in its question to the jury pool, its specific question to the jury regarding relationships with individuals charged with crimes was: "But anybody have any close, personal friends that have been charged with crimes?" Hence, the prosecution wholly failed to ask the potential jurors if any family members had been charged with crimes. The majority's statement that "the State asked the venire whether any of them had a close, personal friend *or family member* who had been charged with a crime" is inaccurate. (Maj. Op. ¶ 35).

¶74.    The majority additionally states that "there was no undisputed evidence that the jurors were not related." (Maj. Op. ¶ 35). Yet, the opposite of that statement is far more true. No evidence exists in the record that those jurors were of any relation. Requiring the opponent of a peremptory strike to present undisputed evidence to rebut every explanation that the

32

proponent of the strike offered would force a party challenging a peremptory strike somehow to: 1) anticipate the jurors on which the proponent of the strike may intend to use peremptory strikes; 2) imagine each possible explanation the proponent may use to defend that strike; and 3) be prepared to disprove any and every reason provided by the proponent. In the alternative, the challenging party would have to be allowed a recess after making a ***Batson*** challenge, so it could be provided an opportunity to develop information disproving the proffered explanation. The defense counsel in this case sufficiently responded to the State's proffered explanation when he pointed to the glaring absences in the State's assertions. The majority finds that the trial court may accept vague, unsupported reasons for striking jurors, and allows the State idly to sit by, basking in the insurmountable security granted to it by this Court.

¶75.    The comment to Mississippi Rule of Professional Conduct 3.8 states that the prosecutor "has the responsibility of a minister of justice and not simply that of an advocate." M.R.P.C. 3.8 cmt. Nothing in the record rebuts the conclusion that prosecutor's proffered explanations were based on anything other than the fact that these two potential jurors had the same last name as people who had been prosecuted before. In essence, the prosecution's explanations resound in pretext. If the prosecution had been concerned about those two jurors possibly being related to "bootleggers" or to individuals with the same last name who had been prosecuted, the prosecutor should have asked that question in voir dire. The prosecution failed to do this. It is insufficient simply to state that individuals with the same last name

have been prosecuted without more.[7] The assertion that a juror was struck because people of the same last name had been prosecuted previously, without more, is suggestive of pretext.[8]

¶76. The majority cites *Chamberlin v. State*, in which the State struck seven African American potential jurors. *Chamberlin v. State*, 989 So. 2d 320, 339 (Miss. 2008). The majority states that "the Court wrote that because the objector failed to offer any proof that the State's reasons were pretextual, the State's reasons for the challenges were the only

---

[7] *See Looney v. Davis*, 721 So. 2d 152, 166 (Ala. 1998) ("Thus, we hold that the trial court erred in finding that the speculation of plaintiff's counsel that K. H. knew Dr. Looney or his family was sufficient to rebut the presumption of discrimination."); *Ridley v. State*, 510 S.E.2d 113, 117 (Ga. App. 1998) ("In allowing the State to strike a juror based on nothing more than the juror's last name, without any inquiry into whether the juror is in fact related to a criminal defendant, the Supreme Court opens the door to a myriad of prosecutorial misconduct and essentially insulates such conduct from any meaningful review by this Court. It is a rare juror, even in a small town, who does not share a last name with some current or prior defendant, but who may not be even remotely related in any other way."); *Ex parte Bird*, 594 So. 2d 676, 683 (Ala. 1991) ("Here, a simple question directed to the veniremember could have dispelled any doubt about a possible relationship. However, neither the State nor the court engaged in any voir dire on this subject. In the absence of any examination, the trial judge had nothing on which to make the required 'sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as he [knew] them.'"); *State v. Marrs*, 180 W. Va. 693, 695, 379 S.E.2d 497, 499 (1989) ("However, if this were the prosecuting attorney's true reason for striking Mr. Kelsor, she could have asked him whether he or a relative of his had a criminal warrant pending against him, or she could have asked the entire jury panel if any of them was related to someone with criminal charges pending against him. If we are to give real effect to the U.S. Supreme Court's decision in *Batson*, we must require the State in cases such as this to give a non-racial, *credible* justification for striking the only member of defendant's race from the panel.") (emphasis in original).

[8]In oral argument, counsel for the State admitted that the record contained no indication that the prosecutor had provided the proffered explanations based on his own personal knowledge. The State also admitted that the record contained no indication that everybody with the same last name in Calhoun County, Mississippi, was related, and contained no indication that African Americans in Calhoun County with the same last name were related. Additionally, the record failed to indicate that every African American in Calhoun County with the last names McKinney or Glaspie was a bootlegger.

34

considerations before the trial court." In ***Chamberlin***, however, the defense offered no rebuttal to the State's reasons for the first four jurors challenged. ***Id.*** And on the remaining three jurors, the defense failed to rebut the specific reasons proffered by the State. ***Id.***

¶77. The majority further writes that, "in the absence of rebuttal by the challenging party, the trial court is limited to the reasons proffered by the party exercising the peremptory strike." (Maj. Op. ¶ 40). The majority's statements are misleading. Unlike in ***Chamberlin***, here, counsel for Jones did rebut the State's proffered explanations by pointing out correctly that the prosecutor had failed to state that an actual relationship existed and had not questioned the jurors during voir dire concerning the potential relationship. Thus, the majority errs in its conclusion that defense counsel had failed to rebut the State's proffered explanations. At that point, the trial court abused its discretion in failing to require the State to support its proposed explanation with some form of verification that an actual relationship existed. Jurors must not be disqualified based solely on the State's suspicions that the jurors *could* have been related to people that had been convicted.

¶78. A defendant has the right to be tried by a jury "whose members are selected by nondiscriminatory criteria." ***Powers v. Ohio***, 499 U.S. 400, 405, 111 S. Ct. 1364, 1367, 113 L. Ed. 2d 411 (1991). It is true that the trial court may evaluate a prosecutor's credibility, but it must not allow a prosecutor to offer unsupported explanations for striking a potential juror. And this Court must ensure that the trial court conducts a *meaningful* evaluation of the question of pretext, as opposed to the perfunctory one that occurred in this case. This practice protects both the parties at trial as well as the citizens who potentially may serve on a jury.

¶79.   As recently as last year, the United States Supreme Court in ***Peña-Rodriguez v. Colorado***, expressed the importance of eliminating race-based discrimination from the jury system, stating:

> The Nation must continue to make strides to overcome race-based discrimination. The progress that has already been made underlies the Court's insistence that blatant racial prejudice is antithetical to the functioning of the jury system and must be confronted. . . . It is the mark of a maturing legal system that it seeks to understand and to implement the lessons of history. The Court now seeks to strengthen the broader principle that society can and must move forward by achieving the thoughtful, rational dialogue at the foundation of both the jury system and the free society that sustains our Constitution.

***Peña-Rodriguez v. Colorado***, 137 S. Ct. 855, 871, 197 L. Ed. 2d 107 (2017). Should the State have concerns regarding the closeness of individuals previously prosecuted in the county to a potential juror, it is imperative that the trial court require the State to develop meaningful information through individual voir dire or verification through others. The State's assumption that all persons bearing the same last name are related, but especially all African Americans bearing the same last name, is unfounded.[9] That the trial court blindly would accept such an assertion, without question or reservation, is an abuse of discretion.

¶80.   The protections of ***Batson*** do not apply only to the parties in a case. ***Batson***'s protection from racial discrimination in the jury-selection process is twofold. First, that

---

[9] The infirmity in the State's reasoning, and the trial court's blind acceptance of that reasoning, can be shown by this illustration. A computer search of the inmates in the custody of the Mississippi Department of Corrections reveals seventy inmates who share the same last name as the author of this dissent. This number includes several inmates who were convicted in that author's home county. The fact that these seventy inmates, some of whom were convicted in the home county of the dissent's author, share the same last name as the author of the dissent, is not indicative of any relationship between the dissent's author and these seventy persons. Nor does it in any way suggest or indicate that the author of the dissent knows, or knows of, any of these seventy persons.

protection from racial discrimination in the jury-selection process extends to the litigants. A litigant has the right to participate and place information before the trial court. Second, the protection from racial discrimination in the jury-selection process extends also to potential jurors. *See Campbell v. Louisiana*, 523 U.S. 392, 397-98, 118 S. Ct. 1419, 1423, 140 L. Ed. 2d 551 (1998) (holding that a defendant has standing to bring an equal-protection challenge to racial discrimination against persons excluded from jury service because, "given the economic burdens of litigation and the small financial reward available, 'a juror dismissed because of race probably will leave the courtroom possessing little incentive to set in motion the arduous process needed to vindicate his own rights.'"). Those potential jurors are not given an affirmative opportunity to question the jury-selection process. Nor can we assume that the interest of the potential jurors in being free from racial discrimination is so aligned with the interests of the litigants as to be protected by the litigants. The burden of protecting potential jurors from racial discrimination rests squarely with the court. It is therefore the responsibility of the trial court to give meaningful review, rather than mere lip service, to the question of pretext in jury selection. Under the facts of this case, I would find that the trial court abused its discretion by giving mere lip service, rather than meaningful review, to the issue of pretext. I would reverse and remand this case for a new trial. Therefore, I dissent.

**WALLER, C.J., KITCHENS, P.J., AND ISHEE, J., JOIN THIS OPINION.**